[Crim. No. 30823. Second Dist., Div. Five. Aug. 14, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE H. RICHARDSON, Defendant and Appellant.

## COUNSEL

Paul N. Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Joseph Levine, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Stephen M. Kaufman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STEPHENS, J.**—Following trial by jury George H. Richardson was convicted of one count of conspiracy to commit grand theft and forgery (Pen. Code, § 182, subd. 1; count 1),[1] four counts of forgery (Pen. Code, § 470; counts 2, 3, 4 and 5); four counts of attempted grand theft (Pen. Code, §§ 664/487, subd. 1; counts 6, 7, 8 and 9); and one count of attempted receiving stolen property (Pen. Code, §§ 664/496; count 10). Consecutive sentences were imposed as to counts 2 and 5; count 1 was ordered to run concurrently with the sentences on counts 2 and 5; counts 3, 4, 6, 7, 8, 9 and 10 were ordered stayed pending completion of sentences on counts 1, 2 and 5 and thereafter permanently.

Defendant appeals the judgment contending: "I. The trial court committed reversible error by failing to instruct the jury, sua sponte, pursuant to CALJIC No. 2.91. II. The trial court committed prejudicial error when it instructed the jury pursuant to CALJIC No. 2.62—'Defendant testifying—when adverse inference may be drawn'—inasmuch as the instruction was not based on the evidence and caused appellant's testimony to be improperly evaluated on standards different from that of other witnesses. III. In sentencing appellant consecutively on two of the four forgery counts, the trial court violated the proscription against multiple punishment contained in Penal Code section 654. IV. The concurrent sentence which appellant received on the conspiracy count

---

[1] In making its guilty finding on the conspiracy charge, the jury found "overt acts number(s) 2, 3, 4, 5, 6, 7, 8 and 9 to be true, as charged in Count I of the information." However, appellant was charged in count 1 with overt acts 1 through 6 only. The judgment will be modified accordingly.

violated the proscription against multiple punishment of Penal Code section 654 inasmuch as said statute is violated where, as here, the sentence imposes punishment for conspiracy to commit illegal acts and for the illegal acts themselves, in spite of the fact that the conspiracy has no objective greater than the specific acts charged. V. Appellant was improperly convicted of four separate counts of both attempted grand theft and forgery in violation of the rule enunciated in *People* v. *Bailey* (1961) 55 Cal.2d 514, requiring that only one offense be charged where the evidence discloses only one general intent."

## THE FACTS

Succinctly stated, appellant was charged with participating in a scheme whereby City of Los Angeles Controller's warrants were obtained by an unauthorized means and made payable to fictitious commercial payees for amounts in excess of $800,000 each. The plan was that the warrants would be negotiated by participants in the scheme and the proceeds thereof hidden before the warrants were returned to the City of Los Angeles for payment, inasmuch as they would not have been honored by the city.

Four separate warrants are involved in the instant prosecution.[2] On November 20, 1974, appellant, using the fictitious name "Mr. Green," gave four warrants to Morton Freeman whom he had met through Joyce Lewis. Freeman mailed the warrants to Richard Keates in New York. Although not part of the plan, Keates retained one warrant (counts 5 and 9) and ultimately it was successfully negotiated. Keates gave three of the warrants to Bernard Howard who in turn gave them to Michael Raymond. Approximately one week later, Raymond became an informant for the City of Los Angeles and negotiated a "reward" for returning the three remaining warrants to the city.

---

[2]Counts 2 and 6 relate to Demand Check No. 046182; Mercantile Trading Corporation, payee; $856,729.42.

Counts 3 and 7 relate to Demand Check No. 046185; National Equipment Group, Inc., payee; $880,195.12.

Counts 4 and 8 relate to Demand Check No. 046186; Schaffer Supplies, Inc., payee; $826,987.53.

Counts 5 and 9 relate to Demand Check No. 046187; Crocker International Bank of New York, payee; $902,125.13.

In that both Crocker Bank and the City of Los Angeles are the named victims of the count 5 forgery charge, it differs from counts 2, 3 and 4 wherein the only named victim of the forgeries is the City of Los Angeles.

After Freeman sent the warrants to Keates, Keates told Freeman to wait five to seven days and to then go to Montreal where they would divide up the money. Freeman relayed this information to Lewis. They traveled separately to Montreal and stayed at different hotels. When Freeman telephoned Lewis in Montreal he discovered she had taken two other people with her on the trip. Testimony at trial revealed it was appellant and Agnes Woodley who had accompanied Lewis.

Freeman had arrived in Montreal on December 2, 1974, and had waited. Keates called on December 6, 1974, informed Freeman there had been a change of plans and told him to return to Los Angeles and that they would meet at the Century Plaza Hotel. En route to Los Angeles Freeman telephoned Lewis in Montreal to tell her he was on his way home.

Meanwhile, on December 5, 1974, Raymond told Howard to meet him in Los Angeles. Howard thereafter told Keates that the money was now to be picked up in Los Angeles and asked Keates to meet him at the Century Plaza Hotel. On December 6, 1974, Howard took a plane from New York to Los Angeles and Raymond met him at the airport. In Raymond's car, which had been wired for sound, Raymond drove Howard to Raymond's room at the Beverly Wilshire Hotel. The room had also been "bugged." In the evening the two men went to the lobby of the Century Plaza Hotel.

Neither Howard nor Freeman knew of the other's involvement in the scheme. However, Howard knew Freeman had been engaged in business dealings with Keates. Therefore, when Howard saw Freeman enter the Century Plaza Hotel lobby he approached him. Arrangements ultimately were made to meet in the lobby of the Beverly Wilshire Hotel. As per plan, a district attorney investigator had left simulated money in two attache cases and a flight bag at the Beverly Wilshire Hotel in Raymond's name and the hotel had been placed under surveillance. Howard and Raymond drove there in Raymond's car. Raymond gave Howard the cases and flight bag. When Freeman arrived and was given the bags, he and Howard were arrested.

Howard and Freeman were the only coconspirators to testify at appellant's trial. Freeman decided to testify against his coconspirators when he read in the newspapers that Keates had crossed the Canadian border with $150,000 during the time he had been waiting for Keates in Montreal. Freeman thereafter attempted to locate Keates and the man

known to him only as "Mr. Green." He drew sketches of "Mr. Green" for the investigators. When shown a photographic layout he identified one picture as being "Mr. Green." The photograph was of appellant. Appellant was thereafter arrested in Mobile, Alabama.

At trial Freeman testified that appellant was the "Mr. Green" who had given him the four controller's warrants. Agnes Woodley, a longtime friend of Lewis', testified that she had accompanied Lewis on the trip to Montreal. Lewis had told her it was a business trip. Appellant was with them. Lewis, claiming she did not have her credit card for the tickets, had used Ms. Woodley's American Express credit card. Ms. Woodley's receipts disclosed that three tickets to Montreal were purchased .on December 1, 1974, one in the name of appellant. Other receipts showed that three people had stayed at the Montreal Aeroport Hilton between December 2d and 5th, and supported Ms. Woodley's testimony regarding her stay in Montreal with appellant and Lewis.

Huey Auguar, a friend of Lewis', also testified. He had been asked by Lewis to drive appellant, Lewis and Ms. Woodley to the airport for the trip which took them to Montreal. He also picked them up at the airport upon their return. Auguar said shortly after the Montreal trip appellant told him to let Lewis know that if appellant "didn't get some consideration about the money, his people was going to send a visitor over there." At the time he did not understand what appellant meant. He testified further that he had on a few occasions seen Freeman and appellant together in Lewis' room at her motel.

Appellant testified in his own behalf. He acknowledged his trip to Montreal with Lewis and Ms. Woodley, but in explanation thereof asserted that he had accompanied Lewis as her bodyguard. He denied, however, knowing Keates, Freeman or Howard; denied he was "Mr. Green;" denied knowledge of the forgery scheme and denied having made the incriminating statement about the money to Auguar.

CALJIC No. 2.91

■ We find no merit in appellant's contention that the trial court committed reversible error by failing to instruct the jury *sua sponte* with CALJIC No. 2.91.[3] "Section 1096a of the Penal Code declares that when

---

[3]CALJIC No. 2.91 provides: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. You must be satisfied beyond a reasonable doubt of the accuracy of the

the statutory definition of reasonable doubt is given (see Pen. Code, § 1096), no other instruction need be given defining reasonable doubt. Despite this section, a defendant, upon proper request therefor, has a right to an instruction that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered. [Citation.]" (*People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847].)

In *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, at page 885 [123 Cal.Rptr. 119, 538 P.2d 247], our Supreme Court reiterated the principle set forth in *Sears* that upon request a defendant is entitled to an instruction " 'relating particular facts to any legal issue.' " (*People* v. *Sears, supra,* at p. 180.) More on point, in *Rincon-Pineda* the court stated: "Such a *requested* instruction may, in appropriate circumstances, relate the reasonable doubt standard for proof of guilt to particular elements of the crime charged [citation] or may 'pinpoint' the crux of a defendant's case, such as *mistaken identification* or alibi. [Citations.]" (*Id.,* at p. 885; italics added. See also *People* v. *Ware* (1978) 78 Cal.App.3d 822, 842 [144 Cal.Rptr. 354].)

In the instant case, however, there was no request to the court to instruct with CALJIC No. 2.91. In asserting that the trial court had an affirmative duty to give, *sua sponte,* an instruction on his theory of the case, appellant relies on our Supreme Court's holding in *People* v. *Stewart* (1976) 16 Cal.3d 133 [127 Cal.Rptr. 117, 544 P.2d 1317], which case quoted extensively from its prior decisions in *People* v. *St. Martin* (1970) 1 Cal.3d 524 [83 Cal.Rptr. 166, 463 P.2d 390], and *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913], as follows: " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations.]" (*People* v. *Stewart, supra,* at p. 140.) We do not believe that CALJIC No. 2.91, relating identification to reasonable doubt, is the type of instruction referred to in *Stewart* as being necessary for the jurors' comprehension in light of the other instructions given.

---

identification of defendant as the person who committed the offense before you may convict him. If, from the circumstances of the identification, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

Here, the court gave CALJIC No. 2.90 which instructed the jury that the defendant was entitled to an acquittal unless his guilt was shown beyond a reasonable doubt; CALJIC No. 2.01 (1975 revision) which admonished the jurors that each fact essential to complete a set of circumstances necessary to establish a defendant's guilt must be proved beyond a reasonable doubt; and CALJIC No. 2.20, the general instruction on the credibility of witnesses. The jurors were fully instructed with CALJIC Nos. 3.10, 3.11, 3.12, 3.13, 3.14, and 3.18 as to the standard to be used in evaluating accomplice testimony. They were also specifically instructed that witnesses Morton Freeman and Bernard Howard were accomplices as a matter of law and that therefore their testimony required corroboration. CALJIC No. 3.18 cautioned that the testimony of an accomplice should be viewed with distrust. These instructions sufficiently informed the jurors of the People's burden of proof.

■ Moreover, we note that although the court in *Stewart* held that an erroneous failure to instruct on an "affirmative defense" relied on by the defendant constitutes a denial of his constitutional right to have the jury determine every material issue presented by the evidence which " 'is in itself a miscarriage of justice . . . .' " (*id.,* at p. 141), a defense based upon mistaken identification is not such an independent affirmative defense; that is, it cannot be considered by itself, but must be considered with all the other evidence. Therefore, in the absence of a request for a specific instruction relating reasonable doubt to identification, it is sufficient that the jury be instructed generally to consider *all* the evidence in the case. (See *People* v. *Hoffmann* (1970) 7 Cal.App.3d 39 [86 Cal.Rptr. 435]; cf. *People* v. *Rubio* (1977) 71 Cal.App.3d 757, 770 [139 Cal.Rptr. 750].)

Appellant urges that *People* v. *Guzman* (1975) 47 Cal.App.3d 380 [136 Cal.Rptr. 163], and *People* v. *Gomez* (1972) 24 Cal.App.3d 486 [100 Cal.Rptr. 896], cases in which the court's failure to give a requested instruction relating identification to reasonable doubt was considered nonprejudicial, are distinguishable because they involved alibi defenses and CALJIC No. 4.50 was given, the defendants thereby receiving the benefit of an additional reasonable doubt instruction. We note, however, that the cases are also distinguishable in another respect: In each case an instruction relating identification to reasonable doubt was *requested.*

Appellant asserts that the situation presented in the instant case is most analogous to *People* v. *Roberts* (1967) 256 Cal.App.2d 488 [64 Cal.Rptr. 70], wherein the "close case" test was applied requiring reversal for what

might otherwise be considered nonprejudicial error. In that case a requested instruction relating reasonable doubt to identification was refused. The conviction of Roberts rested entirely on his identification by police officers. The lighting conditions under which he had been observed engaging in illegal activities had been only "fair." His arrest had been deferred. There was no corroboration. The court concluded that under those circumstances the failure of the trial court to give the *requested* instruction was prejudicial error and required reversal.

There is little similarity between *Roberts* and the case at bench. Even had the court erred by not giving CALJIC No. 2.91, *sua sponte,* still we would not apply the "close case" test. Contrary to appellant's assertion, there was ample corroboration of Morton Freeman's in-court identification of appellant as "Mr. Green." Ronald Maus, investigator for the Los Angeles County District Attorney's office, testified that Freeman had picked appellant's picture from a photographic layout and identified him as the man he knew only as "Mr. Green." This identification led to appellant's arrest.

The testimony of Agnes Woodley and Huey Auguar, neither of whom were charged as accomplices, established that appellant accompanied Joyce Lewis to Montreal where the funds obtained from negotiating the forged instruments were to be disbursed. Ms. Woodley's American Express Card receipts supported her testimony. Huey Auguar confirmed appellant's presence on the trip to Montreal and his testimony in regard to appellant's statement to him about the money showed appellant knew the purpose of their stay in Canada. Further, Huey Auguar testified that he had seen Freeman and appellant together in Lewis' room at her motel. The evidence of appellant's complicity in the forgery scheme prompted the judge at his probation and sentencing hearing to remark that "the proof was overwhelming." Under these circumstances it can hardly be said that the "close case" test used in *Roberts* would be applicable even had there been error.

### CALJIC No. 2.62

■ Instruction of the jury in accordance with CALJIC No. 2.62[4] did not constitute *Griffin* error as asserted by appellant. The United States

---

[4]CALJIC No. 2.62 provides: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus the decision as to whether he should testify is left to the defendant, acting with the advice and assistance of his attorney. In this case defendant has elected to and has testified as to certain facts. If you find that he failed

Supreme Court in *Griffin* v. *California* (1965) 380 U.S. 609, 611-615 [14 L.Ed.2d 106, 108-110, 85 S.Ct. 1229], proscribed comment upon a defendant's failure to testify as violative of the Fifth Amendment privilege against self-incrimination made applicable to the states in *Malloy* v. *Hogan* (1964) 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489]. However, a court instruction permitting the jury to draw an inference unfavorable to a defendant when he takes the stand and fails to deny or explain matters within his knowledge is proper and does not violate either his federal or state constitutional privilege against self-incrimination. (*People* v. *Ing* (1967) 65 Cal.2d 603, 610-611 [55 Cal.Rptr. 902, 422 P.2d 590]; *People* v. *Perez* (1967) 65 Cal.2d 615, 621 [55 Cal.Rptr. 909, 422 P.2d 597].)

This principle was reiterated recently by our California Supreme Court in *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]. In that case, when the defendant testified and denied guilt as to all crimes charged and sought to establish that the victim's identification of him was mistaken, it was held that he had thus placed the matter of identity squarely in issue and had waived his privilege against self-incrimination to the extent of relevant cross-examination. Therefore, the court stated, an instruction permitting the jury to draw adverse inferences from his refusal to answer questions within the scope of cross-examination was proper. (*Id.,* at p. 760.)

Inasmuch as appellant urges that he explained or denied all evidence presented by the prosecution and he does not claim that the instruction relates to matters beyond the scope of cross-examination, *People* v. *Tealer* (1975) 48 Cal.App.3d 598 [122 Cal.Rptr. 144], on which he relies, is inapposite. In *Tealer* the court determined that giving CALJIC No. 2.62 to the jury did constitute *Griffin* error as the jury was not informed that certain matters not explained or denied by the defendant were outside the scope of proper cross-examination. The net effect was that the jury was told "it could infer guilt from silence." (*Id.,* at p. 607.)

to explain or deny any evidence or facts against him which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable. In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence. The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt."

Appellant argues that he did testify as to his version of the events in question and thereby attempted to "deny or explain" all evidence which had adverse connotations. However, inasmuch as he expressly claimed that he lacked all knowledge of Joyce Lewis' involvement in the forgery scheme, it was important to his defense to have the jury instructed that "it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain" matters as to which he had no knowledge. In addition, of course, it was for the jury to determine whether appellant did in fact deny or explain all of the evidence against him and thus whether the earlier portion of the challenged instruction was applicable.

The jurors were instructed with CALJIC No. 17.31[5] to disregard any instruction which applied to a state of facts which they determined did not exist, and not to conclude that the court had expressed any opinion as to the facts merely because an instruction had been given. We assume the jurors were capable of understanding and correlating all jury instructions which they received. (*People* v. *Romo* (1975) 47 Cal.App.3d 976, 990 [121 Cal.Rptr. 111, 534 P.2d 1015].)

As further proof that he was prejudiced by the jury having been instructed with CALJIC No. 2.62, appellant cites as controlling our California Supreme Court holding in *People* v. *Lyons* (1958) 50 Cal.2d 245 [324 P.2d 556]. In *Lyons,* the defendant complained that the jury had not been specifically instructed regarding the standard to be adopted by them in weighing his explanation of the events. The court stated at page 271: " 'It has been repeatedly held to be improper for the court to single out a particular witness and to charge the jury how his evidence should be considered. [Citations.]' "

That the California Supreme Court did not consider its pronouncement in *Lyons* as precluding an instruction such as CALJIC No. 2.62 from being given to the jury is shown by its subsequent decisions in *People* v. *Ing, supra,* 65 Cal.2d 603, 610-611; *People* v. *Perez, supra,* 65 Cal.2d 615, 621; and most recently, *People* v. *Thornton, supra,* 11 Cal.3d 738, 760. As discussed hereinabove, these cases specifically sanction an instruction to

---

[5]CALJIC No. 17.31 provides: "You have been instructed as to all the rules of law that may be necessary for you to reach a verdict. Whether some of the instructions will apply will depend upon your determination of the facts. You will disregard any instruction which applies to a state of facts which you determine does not exist. You must not conclude from the fact that an instruction has been given that the court is expressing any opinion as to the facts."

the jurors which permits them to draw an inference unfavorable to a defendant who testifies in his own behalf and fails to deny or explain matters within his knowledge if such matters are within the scope of relevant cross-examination. (And also see *People* v. *Mayberry* (1975) 15 Cal.3d 143, 160-161 [125 Cal.Rptr. 745, 542 P.2d 1337].)

## THE CONVICTIONS

◼ Appellant's contention that he was improperly convicted of four counts of attempted grand theft is well taken. The test applied in theft prosecutions in determining if there are separate offenses or one offense is whether the evidence discloses one general intent or distinct and separate intents. (*People* v. *Bailey* (1961) 55 Cal.2d 514, 519 [11 Cal.Rptr. 543, 360 P.2d 39].) Whether a series of wrongful acts constitutes a single offense depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging attempted grand theft from the same entity or person only if the evidence shows that "the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Id.*)

Here, appellant was charged and convicted of attempted grand theft from the City of Los Angeles. That four separate warrants were the means by which this end was to be achieved does not "splinter" the crime into four separate offenses. An appropriate course in these circumstances is to affirm the judgment as to one count of attempted grand theft and reverse as to the other counts. (*People* v. *Lyons, supra,* 50 Cal.2d 245, 275-276; *People* v. *Bowie* (1977) 72 Cal.App.3d 143, 157 [140 Cal.Rptr. 49].)

◼ In *People* v. *Neder* (1971) 16 Cal.App.3d 846 [94 Cal.Rptr. 364], we held that the *Bailey* doctrine should not be extended to forgery. (*Id.,* at p. 852.) Therefore we reject appellant's contention that he was improperly convicted of four separate forgery counts. "The real essence of the crime of forgery . . . is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud. Theft pursuant to a plan can be viewed as a large total taking accomplished by smaller takings. It is difficult to apply an analogous concept to forgery. The designation of a series of forgeries as one forgery would be a confusing fiction." (*Id.,* at pp. 852-853; fn. omitted; and see *People* v. *Bowie, supra,* at pp. 156-157.)

## THE SENTENCE

 We likewise reject appellant's contention that the consecutive sentences imposed for two of his four forgery convictions[6] violated the Penal Code section 654 proscription against multiple punishment as interpreted in *Neal* v. *State of California* (1960) 55 Cal.2d 11 [9 Cal.Rptr. 607, 357 P.2d 839]. Section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ."

 The basic principle enunciated in Penal Code section 654 impliedly precludes double punishment when an act gives rise to more than one violation of the *same* Penal Code section. (*Neal* v. *State of California, supra,* at p. 18; *People* v. *Neder, supra,* at p. 853.) Moreover, the section has been applied not only where there has been one act but also where there has been an indivisible course of conduct. (*People* v. *James* (1977) 19 Cal.3d 99, 119 [137 Cal.Rptr. 447, 561 P.2d 1135]; *People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552]; *People* v. *Beamon* (1973) 8 Cal.3d 625, 637-638 [105 Cal.Rptr. 681, 504 P.2d 905]; *People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637]; *People* v. *Neder, supra,* at p. 853.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal* v. *State of California, supra,* at p. 19; *People* v. *Beamon, supra,* at p. 637.)

In *Neder* we held that defendant's three separate forgeries on three separate sales slips charged on another person's credit card constituted three separately punishable offenses, even though the purchases had all taken place on one day at the same Sears store. In holding that each of the forgeries were separately punishable, we declared our belief that section 654 should not make it a matter of indifference that once having formulated a fraudulent intention, a defendant carried out the intent one or three times. (*People* v. *Neder, supra,* 16 Cal.App.3d 846, at p. 854.) In that case, as in the instant case, each forgery was a separate act, directed to obtaining different property, none playing a part in accomplishing the

---

[6]Counts 2 and 5 were ordered to run consecutively to each other "it being the view of the Court that the two counts involved indicated two separate forgery transactions which could have been foreseen by the defendant at the time the instruments were passed."

end of the others. We held in *Neder* that the defendant's fundamental objective, taking goods from Sears by means of a credit card and forging sales slips, was too broad to tie the separate acts of forgery into one "indivisible transaction." (*Id.*, at p. 854; *People* v. *Bauer, supra,* 1 Cal.3d 368, 377.)

■ That being so, a fortiori, in the case at bench there would have been no violation of section 654 even had the court imposed punishment for each of the four forgery convictions, as four separate warrants were involved, each made payable to a different payee. Moreover, we know of no case wherein a conviction for a coconspirator's act is treated differently for purpose of punishment. Sentence having been stayed on two of the four forgery convictions (counts 3 and 4), appellant cannot be heard to complain.

■ Also unmeritorious is appellant's contention that the concurrent sentence imposed on the conspiracy count violated section 654 of the Penal Code. Although it is true that the section applies equally to concurrent as well as consecutive sentences (*In re Adams* (1975) 14 Cal.3d 629, 636 [122 Cal.Rptr. 73, 536 P.2d 473]), and that its prohibition against multiple punishment is violated by sentencing a defendant for a substantive crime and a conspiracy to commit it, if "a conspiracy had an objective apart from an offense for which the defendant is punished, he may properly be sentenced for the conspiracy as well as for that offense. [Citation.]" (*In re Cruz* (1966) 64 Cal.2d 178, 181 [49 Cal.Rptr. 289, 410 P.2d 825]; *In re Romano* (1966) 64 Cal.2d 826, 828-829 [51 Cal.Rptr. 910, 415 P.2d 798]; *People* v. *Cohen* (1970) 12 Cal.App.3d 298, 328 [90 Cal.Rptr. 612].) Inasmuch as appellant's sentences on two of the forgery convictions were stayed (counts 3 and 4), the conspiracy (count 1) had an objective apart from the two forgery convictions for which he was punished (counts 2 and 5) and the sentence imposed for conspiracy was therefore proper.[7]

In accordance with the above determinations, the judgment is reversed as to counts 7, 8 and 9. The judgment is modified by striking therefrom the language, "and find the following overt acts, numbers 2, 3, 4, 5, 6, 7, 8

---

[7]Appellant contends in a footnote that count 1 may run concurrently with either count 2 or 5, but not with both. We do not believe *People* v. *Blackwell* (1967) 257 Cal.App.2d 313, 324 [64 Cal.Rptr. 642], which he cites as authority for this proposition, correctly states the applicable law.

and 9 true" and substituting therefor, "and find the following overt acts, numbers 2, 3, 4, 5, and 6 true." In all other respects the judgment, as modified, is affirmed.

Kaus, P. J., and Ashby, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 12, 1978. Mosk, J., was of the opinion that the petition should be granted.