[No. B199682. Second Dist., Div. Two. Apr. 28, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
RAMON ALFONSO ZANOLETTI et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II. through XI.

## COUNSEL

Law Office of Allison H. Ting and Allison H. Ting for Defendant and Appellant Ramon Alfonso Zanoletti.

Law Offices of Pritz & Associates and Danalynn Pritz for Defendant and Appellant Magdalena Rosalis Zanoletti.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, James William Bilderback II, Lawrence M. Daniels and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DOI TODD, Acting P. J.**—Ramon Alfonso Zanoletti (Alfonso) and his wife Magdalena Rosalis Zanoletti (Magdalena) appeal from the judgments entered upon their convictions by jury of insurance fraud. Specifically, Alfonso was convicted of 19 counts of felony insurance fraud (Pen. Code, § 550, subd. (a)(1))[1] (counts 1, 4, 7, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 32, 34, 38, 40, 42 & 45), with findings of a pattern of fraudulent taking of more than $100,000 (§ 186.11, subd. (a)(3)) and damages exceeding $50,000 (§ 12022.6, subd. (a)(1)). He was also convicted of one count (count 3) of misdemeanor unauthorized practice of law (Bus. & Prof. Code, § 6126, subd. (a)). Magdalena was convicted of the same insurance fraud counts and special allegations, plus another 19 counts of felony insurance fraud (§ 550, subd. (a)(5)) (counts 2, 5, 8, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 33, 35, 39, 41, 43 & 46), with the same special allegations.

The trial court denied probation and sentenced each appellant to 22 years in state prison calculated as follows: As to count 1, the midterm of three years; as to the remaining 18 counts under section 550, subdivision (a)(1), one year (or one-third the midterm) to be served consecutively; plus one year on the section 12022.6, subdivision (a)(1) allegation. Pursuant to section 654, the court stayed the sentence on count 3 (unauthorized practice of law), and stayed the sentences on the 19 additional counts of insurance fraud under

---

[1] All further statutory references are to the Penal Code, unless otherwise noted.

section 550, subdivision (a)(5), striking the special allegations as to these counts.

The trial court also ordered each appellant to pay a $200 restitution fine (§ 1202.4, subd. (b)), a $20 DNA penalty assessment (Gov. Code, § 76104.7), a $20 court security fee (§ 1465.8, subd. (a)(1)), a $200,000 aggravated white collar crime fine (§ 186.11, subd. (c)), and $108,533 in victim restitution to the defrauded insurance companies (§ 1202.4, subd. (f)), and imposed and suspended a $200 parole revocation fine (§ 1202.45). Appellants each received 55 days of custody credit.

On appeal, appellants each raise numerous contentions, including instructional errors, sufficiency of the evidence, expiration of a statute of limitations and sentencing errors. Magdalena also contends that she could not have been convicted of violating more than one subdivision of section 550 and that her convictions of violating both subdivision (a)(1) and (5) run afoul of the single-intent-and-plan doctrine. We disagree and publish this portion of our opinion. Although we find most of appellants' remaining contentions to be without merit in the unpublished portion of our opinion, we remand the matter for determination as to whether prosecution should be tolled on count 3 against Alfonso and for determination of the appropriate amount of the DNA identification fund penalty assessment (Gov. Code, § 76104.6). We also modify the judgments on our findings of sentencing errors. In all other respects, the judgments are affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

*Background*

Magdalena worked as an office manager at the Franklin Chiropractic Clinic on West 8th Street in Los Angeles (the clinic) and received an annual salary of $40,000. Clarence Franklin worked as a chiropractor at the clinic. Magdalena's husband Alfonso leased the space for the clinic and also leased some of the medical equipment, including the X-ray machine, and paid the clinic's telephone bill. Alfonso, who was not an attorney, had an office at the Law Offices of Taghizadeh & Associates (the law office). Between December 12, 2003, and December 3, 2004, Alfonso received $183,115.42 from the law firm in sporadic checks of unequal sizes, often with the notation "for ex-services." Appellants filed joint tax returns.

On March 9, 2004, law enforcement arrested Constantino Pineda, a "capper" who specialized in organizing and staging car accidents for the purpose of engaging in insurance fraud. Pineda was in possession of a "capping book" that listed names, including Alfonso's, dates, and other information pertaining to accidents he had organized. Also in his possession were business cards for Alfonso and the clinic. Based largely on information obtained from Pineda, search warrants were executed at the clinic and the law office. Various documents were seized from the clinic, including a capping book listing patients who corresponded to those in Pineda's capping book.

California Highway Patrol Sergeant Tannon Brown, an expert on automobile insurance fraud, led a multiagency investigation on insurance claims arising from patients listed in the clinic's capping book. The investigation focused on 21 patients, as discussed below, and the period between January 2003 and December 2004. Sergeant Brown opined that the clinic was an insurance fraud mill, that Alfonso was a capper who specialized in staging accidents and then referring people to both the clinic and the law office, and that Magdalena prepared fraudulent paperwork that was provided to the law office, which then submitted the paperwork to insurance companies in support of demands for payment.

*Counts 1–3 (Jose Gabriel Martinez Ortiz), 4–5 (Manuel Trujillo) and 7–8 (David Luna Hernandez)*

On or about May 1, 2004, Jose Gabriel Martinez Ortiz, Manuel Trujillo and David Luna Hernandez were riding together in a truck when it was struck by another vehicle. They testified that Alfonso approached them, identified himself as an attorney, provided his contact information, and stated that he had seen the accident and taken photographs of the damage and that the men could be compensated for their injuries. Alfonso later drove Ortiz to the law office and agreed to act as his "attorney." Ortiz then went to the clinic, where he subsequently returned approximately 15 times for treatment that lasted only minutes; Dr. Franklin never asked Ortiz how the treatment was progressing. At Magdalena's direction, Ortiz signed sign-in sheets falsely indicating that he had received treatment 30 times.

Trujillo and Hernandez also went to the clinic. Trujillo went to the clinic approximately seven times and received cursory treatment. At Magdalena's direction, he signed sign-in sheets falsely indicating that he had received treatment 31 times. Hernandez, who was not injured in the accident, also signed for more treatments than he actually received.

The clinic submitted the falsified paperwork to the law office, which then submitted some of the paperwork to USAA Insurance Company, which paid approximately $18,000 to settle the claims. Ortiz, Trujillo and Hernandez subsequently received approximately $2,000 each from the law office. Trujillo and Hernandez pled guilty to insurance fraud. Ortiz was apparently charged with insurance fraud, but the record is not clear as to the outcome of his case.

### Counts 10–11 (Veronica Mendez) and 12–13 (Silvia Gonzalez)

Sisters Veronica Mendez and Silvia Gonzalez participated in a staged car accident on February 7, 2004. Mendez testified that at the direction of an unidentified capper they went to the clinic where they met with Alfonso, who already knew about the accident. Mendez told Alfonso that she was not injured, but he told her that she would still receive treatment. Mendez testified that she and her sister went to the clinic approximately 15 times but, at Magdalena's direction, Mendez signed sign-in sheets indicating she had been to the clinic 29 times. Mendez testified that she signed in 15 times in one day. Gonzalez, who did not testify at trial, signed the same 29 sign-in sheets. At some point, the sisters went to the law office, where Alfonso explained that they would be deposed, and instructed them how to describe the accident and their injuries. Mercury Insurance Company eventually paid $1,981 to settle their claims, and Mendez pled guilty to insurance fraud.

### Counts 14–15 (Lourdes Flores Mancia)

Lourdes Flores Mancia, who lived with Pineda, testified that she went with him to the clinic approximately four times in June 2003, despite having no injuries, and received cursory treatment from Dr. Franklin. At Magdalena's direction, she signed sign-in sheets falsely indicating that she had received treatment on additional occasions. She was represented by Attorney Martin Chu, who submitted falsified paperwork to Farmers Insurance Company, which paid $11,623 to settle the claim of which she received $4,000. She later pled guilty to insurance fraud.

### Counts 16–17 (Daniel Marquez) and 18–19 (Maria Julia Villatoro)

Daniel Marquez and his wife Maria Julia Villatoro testified that on May 21, 2003, they participated in a staged car accident that was planned by Pineda. Although they were not hurt in the accident, they went to the clinic for treatment at Pineda's direction. They each received cursory treatment at the clinic on approximately five occasions but, at Magdalena's direction, they

signed sign-in sheets falsely indicating that they had received treatment on numerous additional occasions. After five visits, Marquez told Magdalena that he did not want any more treatment, but she told him he needed to continue coming to the clinic or his case would be lost, and he signed in another five times before Dr. Franklin released him. Alfonso told Marquez to "fake" that his shoulder and back were hurting. The law office submitted the falsified paperwork to Western United Insurance Company, which paid $2,888 to settle the claims. Villatoro pled guilty to insurance fraud. Marquez was arrested, but it is not clear from the record whether he pled guilty or was even charged.

### Counts 20–21 (Cindy Medrano)

Cindy Medrano, who was not injured, testified that she went to the clinic for treatment at the direction of a neighbor named Jose, who told her she could receive $1,000 by claiming to be injured. Medrano received cursory treatment at the clinic approximately four times, but signed sign-in sheets falsely claiming that she had received treatment 30 times. At least some of the paperwork was prepared by Magdalena. Medrano was represented by Attorney Michael Payman Kade, though she never met him. Kade submitted paperwork from the clinic to Mercury Insurance Company, which paid $3,500 to settle the claim. Medrano received $200, and pled guilty to insurance fraud.

### Counts 22–23 (Maria Estella Escobar) and 24–25 (Juana Pacas)

Maria Estella Escobar, her daughters Tiana and Mercy, and Juana Pacas were in a car accident on September 16, 2004. Escobar testified that at a coworker's suggestion she went to the clinic, where she was interviewed by Alfonso, who said he would take her case. Escobar referred Pacas to the clinic. Escobar and Pacas both testified that they went to the clinic approximately 18 times and received cursory treatment. At Magdalena's direction, both Escobar and Pacas signed sign-in sheets falsely indicating that they had received treatment on numerous additional occasions. Escobar also testified that Mercy received treatment at the clinic, but Tiana did not. The law office submitted the falsified paperwork in support of a demand on behalf of Escobar, both her daughters, and Pacas. USAA Insurance Company paid $13,500 to settle the claims. Escobar and Pacas subsequently met Alfonso at the law office and received checks from him. Escobar pled guilty to insurance fraud.

### Counts 26–27 (Griselda Andino) and 28–29 (Sinthia Sandoval)

Griselda Andino and her daughter Sinthia Sandoval testified that they were in a car accident on November 4, 2004, and were referred to the clinic by a

family friend. At Magdalena's direction, they both signed sign-in sheets falsely indicating that they had received treatment on far more occasions than they actually did. At some point Andino met with Alfonso to discuss her case, and Sandoval was under the impression that Alfonso was her attorney. The law office submitted paperwork from the clinic to Mercury Insurance Company, which did not pay any money on the claims. Both Andino and Sandoval pled guilty to insurance fraud.

### Counts 32–33 (Giovanni Morales)

Giovanni Morales testified that he and three companions participated in a staged car accident on April 19, 2004. He and his companions were taken by an unidentified capper to the clinic, where they spoke to Alfonso. At Magdalena's direction, Morales signed sign-in sheets falsely indicating that he had received treatment on far more occasions than he actually did. The law office submitted paperwork from the clinic to Hartford Insurance Company, which paid $38,462 to settle the claims. Morales eventually received a check from the capper, and pled guilty to insurance fraud.

### Counts 34–35 (Miguel Zuniga)

Miguel Zuniga testified that he was in a car accident in December 2003 and was told by a family friend that Alfonso was a "good lawyer." Zuniga met with Alfonso, who referred him to the clinic. Although he only received treatment approximately six times, at Magdalena's direction he signed sign-in sheets falsely indicating that he had received treatment approximately 30 times. The law office submitted paperwork from the clinic to Farmers Insurance Company, which paid $6,094 to settle the claim. Zuniga later went to the law office and received a check for $2,000. At Alfonso's insistence, he had his car fixed at Alfonso's body shop, and eventually pled guilty to insurance fraud.

### Counts 38–39 (Bernaldo Diaz Ramos), 40–41 (Jose Martin Ramos), 42–43 (Jose Santos Lara Cabrera) and 45–46 (Clorinda Gonzalez)

Bernaldo Diaz Ramos, his brother Jose Martin Ramos, Jose Santos Lara Cabrera and Clorinda Gonzalez were in a car accident in October 2003. They testified that they all went to the clinic for treatment and, at Magdalena's direction, they all signed sign-in sheets falsely indicating that they had received treatment on more occasions than they actually did. Bernaldo Ramos and Jose Cabrera met with Alfonso and believed him to be their attorney. The law office submitted paperwork from the clinic to Viking Insurance Company, which paid $12,000 to settle the claims. Jose Ramos eventually received a

check for approximately $1,333 directly from Magdalena. He, his brother Bernaldo and Cabrera eventually pled guilty to insurance fraud.

*Defense Evidence*

Ines Guevara, Bertha Rios, Jesus Gonzalez and Jenny Lopez all testified that they received treatment at the clinic and they were never asked to sign for more treatments than they received.

Magdalena testified on her own behalf. She and Alfonso had been married 35 years and have two daughters. She had worked at the clinic approximately 11 years, and denied directing patients to sign for more treatments than they received. She attributed errors in the billings to human error. Alfonso would meet clients at the clinic and also discussed patients with her. Alfonso leased the space for the clinic and paid the clinic's telephone bill.

Alfonso testified on his own behalf. He worked at the clinic from 1992 through 1995 as an administrator, and again from 2003 to 2006, though he did not recall that time very well. He also began working at the law office around September 2003. As to the $183,000 he received from the law office in 2004, he cashed the checks, then returned an unspecified sum to the law office, though he paid taxes on the full amount. He acknowledged the leases for the clinic's space and medical equipment were in his name. He denied staging accidents, telling anyone to lie, offering to pay anyone for referrals and claiming to be an attorney. He met Pineda only once. He met with Daniel Marquez, and worked on the claims pertaining to Jose Gabriel Martinez Ortiz, Manuel Trujillo, David Luna Hernandez, Veronica Mendez, Silvia Gonzalez, Maria Estella Escobar, Juana Pacas, Griselda Andino, Sinthia Sandoval, Giovanni Morales, Miguel Zuniga, Bernaldo Diaz Ramos, Jose Martin Ramos, Jose Santos Lara Cabrera and Clorinda Gonzalez.

Pineda did not testify at trial.

*Prosecution Rebuttal Evidence*

Jose Gabriel Martinez Ortiz testified that Alfonso offered to pay him a $500 referral fee for referring accidents.

## DISCUSSION

I. *Convictions of Both Section 550, Subdivision (a)(1) and Subdivision (a)(5).*

Insurance fraud is proscribed by section 550, subdivision (a), which includes nine enumerated acts that constitute violations.[2] Each section 550, subdivision (a)(1) count charged against appellants related to an incident involving a specific individual; there was a corresponding subdivision (a)(5) charge for the same incident. For the first time on appeal, Magdalena contends that she could not have been convicted of violating both subdivisions of section 550, reasoning that the different subdivisions merely describe different means of committing the single offense of insurance fraud. She argues that because her conduct was more completely covered by section 550, subdivision (a)(5), she should not have been convicted of also violating section 550, subdivision (a)(1). Alternatively, she contends that her convictions of violating both subdivisions run afoul of the single-intent-and-plan doctrine.

### A. *Multiple Convictions Were Appropriate*

The People agree that the various paragraphs of section 550, subdivision (a) describe different means of committing the single crime of insurance fraud and that a defendant cannot be convicted of multiple violations of section 550, subdivision (a) for the same act. For example, the People note that the conduct described in subdivision (a)(4) seems to be entirely encompassed by subdivision (a)(1). But they argue that Magdalena's multiple convictions were appropriate because they were based on different acts of fraud. We agree.[3]

---

[2] Section 550, subdivision (a) provides in relevant part: "It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

"(1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.

"(2) Knowingly present multiple claims for the same loss or injury, including presentation of multiple claims to more than one insurer, with an intent to defraud.

"(3) Knowingly cause or participate in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim.

"(4) Knowingly present a false or fraudulent claim for the payments of a loss for theft, destruction, damage, or conversion of a motor vehicle, a motor vehicle part, or contents of a motor vehicle.

"(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim."

[3] Magdalena alternatively argues that if we find that acts described in subdivision (a)(1) through (5) of section 550 constitute separate offenses and do not merely describe different ways in which to commit insurance fraud, her convictions under section 550, subdivision (a)(5) must still be reversed because they are based on a legally insufficient theory. Her argument is that when the trial court instructed the jury on the elements of section 550, subdivision (a)(1), it included the

Magdalena analogizes her case to *People v. Ryan* (2006) 138 Cal.App.4th 360 [41 Cal.Rptr.3d 277], which concerned forgery convictions. The defendant in *Ryan* signed another person's name on a check and used that check to make a purchase at a Staples store. The defendant then signed another check in the same person's name and used that check to make a purchase at Gypsy Rose Antiques. As to each store, the defendant was convicted of one count of forgery by signing another's name (§ 470, subd. (a)), and one count of making or passing a forged check (§ 470, subd. (d)). (*People v. Ryan, supra,* at pp. 363–364.) The appellate court determined that the various subdivisions of section 470 described the same crime and that a defendant could not suffer multiple convictions of section 470 based on the forgery of a single instrument. (*People v. Ryan, supra,* at p. 364.) Because the defendant had used a "single instrument" for the Staples purchase and a "single instrument" for the Gypsy Rose Antiques purchase, the defendant could only be convicted of one count of forgery for each purchase. Thus, the court struck both counts of forgery by signing a person's name, but affirmed the two convictions for passing a forged check. (*Id.* at pp. 369–371.)

The *Ryan* court relied on the case of *People v. Craig* (1941) 17 Cal.2d 453 [110 P.2d 403], a rape case, in which the California Supreme Court concluded that the various subdivisions of section 261 described the same crime of rape, and therefore where there was only *one* act of intercourse, the defendant could not be convicted of both forcible rape (§ 261, former subd. 3) and statutory rape (§ 261, former subd. 1). (*People v. Craig, supra,* at p. 455.)

We agree with the People that the case before us is more analogous to *People v. Harrison* (1989) 48 Cal.3d 321 [256 Cal.Rptr. 401, 768 P.2d 1078] (*Harrison*), *People v. Richardson* (1978) 83 Cal.App.3d 853 [148 Cal.Rptr. 120] (*Richardson*) and *People v. Neder* (1971) 16 Cal.App.3d 846 [94 Cal.Rptr. 364] (*Neder*). In *Harrison,* the defendant attacked the victim and inserted his finger into her vagina. As the victim struggled, the defendant's finger became dislodged. He reinserted it a second time for a few seconds, it

elements of section 550, subdivision (a)(3) and (4) and told the jury such conduct could support a conviction under section 550, subdivision (a)(1). She points out that a defendant cannot be convicted of an offense that was neither charged nor necessarily included in the charged offense. (*People v. Lohbauer* (1981) 29 Cal.3d 364, 368 [173 Cal.Rptr. 453, 627 P.2d 183].) But because we agree that the various paragraphs of section 550, subdivision (a) simply describe different means of committing the single crime of insurance fraud, there was no instructional error. Absent a problem of notice, there is no error when an information alleges one theory of guilt but the trial court instructs the jury on a different theory. (See *People v. Kelly* (2007) 42 Cal.4th 763, 791–792 [68 Cal.Rptr.3d 531, 171 P.3d 548] [no error where information alleged malice murder but jury was instructed on felony murder].)

became dislodged again, and he reinserted it a third time for a few seconds. The entire encounter lasted less than 10 minutes. (*Harrison, supra,* at pp. 325–326.) The defendant's conviction of three counts of forcible penetration (§ 289) was affirmed by the California Supreme Court, which held that each penetration amounted to a new and separate crime because each penetration "completed" the crime. (*Harrison, supra,* at pp. 328–330.)

In *Richardson, supra,* 83 Cal.App.3d 853, a forgery case, the defendant obtained four City of Los Angeles Controller's warrants and made them payable to fictitious commercial payees for amounts in excess of $800,000 each. The defendant's convictions of four counts of forgery were upheld. The Court of Appeal stated: " 'The real essence of the crime of forgery . . . is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud.' " (*Id.* at p. 866.) In *Neder, supra,* 16 Cal.App.3d 846, the defendant signed a name to someone else's credit card and then used that card to make three purchases at a Sears department store in one day. The defendant's convictions of three counts of forgery were upheld. (*Id.* at pp. 849–850.)

■ Here, multiple convictions were appropriate. We demonstrate this by considering count 1 (§ 550, subd. (a)(1)) and count 2 (§ 550, subd. (a)(5)) pertaining to Jose Gabriel Martinez Ortiz. Ortiz went to the clinic for treatment 15 times, but at Magdalena's direction he signed sign-in sheets falsely stating that he received treatment 30 times. These sign-in sheets were clearly fraudulent. In addition, the paperwork completed as to the 15 times Ortiz actually received treatment was fraudulent, in that Ortiz testified his treatments lasted only minutes and Dr. Franklin never asked how he was progressing. Magdalena assisted in the preparation of this documentation, as well. She was appropriately convicted under section 550, subdivision (a)(5) for her role in personally creating such documents with the intent that they be presented in support of a fraudulent claim. Under this subdivision, the crime was complete as soon as the writing was completed.

■ With respect to the count under section 550, subdivision (a)(1), the evidence showed that the paperwork on Ortiz that was generated at the clinic was then forwarded to the law office, which submitted some of the paperwork to USAA Insurance Company in support of a fraudulent claim on Ortiz's behalf. Magdalena's separate convictions under section 550, subdivision (a)(1) were appropriately based on the fraudulent claims actually presented by her coconspirators. (See *People v. Cohen* (1970) 12 Cal.App.3d 298, 321 [90

Cal.Rptr. 612] ["A violation of Insurance Code section 556 [precursor to § 550] is complete when a false claim for payment of loss is presented to an insurance company or a false writing is prepared or presented with intent to use it in connection with such a claim whether or not anything of value is taken or received."].) The same analysis applies to all of Magdalena's convictions. Because Magdalena either directly engaged in or conspired to engage in each of these separate acts of insurance fraud, her convictions under both section 550, subdivision (a)(1) and subdivision (a)(5) were appropriate.

### B. *The Single-intent-and-plan Doctrine*

Alternatively, Magdalena contends that her convictions under section 550, subdivision (a)(1) should be reversed because the crimes were committed as part of the same single intent and plan as the corresponding section 550, subdivision (a)(5) crimes.

The single-intent-and-plan doctrine was articulated in *People v. Bailey* (1961) 55 Cal.2d 514, 518–519 [11 Cal.Rptr. 543, 360 P.2d 39], in which our Supreme Court concluded that it was appropriate to consolidate various petty thefts into a single conviction for grand theft, since all of the individual takings were part of a single plan. In that case, the defendant was found guilty of grand theft for unlawfully taking county welfare payments, for which she was ineligible, over an 18-month period. The issue before the court was whether the defendant was guilty of grand theft or a series of petty thefts, as none of the individual payments was greater than $200, but they exceeded that amount in the aggregate. (*Id.* at p. 518.) The court explained that the test as to whether separate offenses were committed is whether one general intent or separate and distinct intents were established by the evidence. (*Id.* at p. 519.) The court noted that this determination depends on the facts of each case, and that a defendant may be convicted of separate counts charging grand theft from the same person "if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Ibid.*)

Magdalena acknowledges that the single-intent-and-plan doctrine has not been applied to the crime of insurance fraud. But she argues that it should be applicable because she was convicted of theft-related offenses. She seems to concede that her argument requires her substantive crimes of insurance fraud to be considered together with the damage enhancements. She also concedes that the doctrine does not apply to the crime of forgery, because forgery is concerned with the means, not the end, as we noted above. (See *Richardson, supra,* 83 Cal.App.3d at p. 866, quoting *Neder, supra,* 16 Cal.App.3d at

pp. 852–853.) Nor has the doctrine been applied to the crimes of identity theft (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 455–457 [78 Cal.Rptr.3d 855]) or burglary (*People v. Washington* (1996) 50 Cal.App.4th 568, 576–579 [57 Cal.Rptr.2d 774]).

■ Insurance fraud under section 550 is also concerned with the means, rather than the end. As defined in subdivision (a)(5), the crime is complete when an individual "[k]nowingly prepare[s], make[s], or subscribe[s] any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim." Under subdivision (a)(1), the crime is complete when a fraudulent claim is "presented." While it can be argued that appellants had a general scheme to present fraudulent insurance claims, nevertheless, the preparation of any writing with the intent to use it to support a false claim constitutes one violation and the knowing presentation of a false claim constitutes another, separate violation. Based on the particular facts here, we find the single-intent-and-plan doctrine inapplicable to the crimes proven here.

II.–XI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Each judgment is modified as follows: (1) to strike the $20 court security fees (§ 1465.8, subd. (a)(1)) and instead to impose a $400 security fee on Alfonso and a $760 security fee on Magdalena; (2) to impose a $40,000 court surcharge (§ 1465.7, subd. (a)); (3) to impose a $140,000 county penalty assessment (Gov. Code, § 76000); (4) to strike the $20 DNA identification fund penalty assessment (Gov. Code, § 76104.7); (5) to impose a state penalty assessment of $200,000 (§ 1464, subd. (a)); (6) to impose a state court facilities construction fund penalty of $60,000 (Gov. Code, §§ 70372, subd. (a), 70375, subd. (b)); and (7) to correctly by show that the $200,000 fine is an aggravated white collar crime fine (§ 186.11, subd. (c)) and not "restitution."

The matter is remanded for determination by the trial court of (1) the appropriate amount of the DNA identification fund penalty assessment (Gov. Code, § 76104.6) to be imposed on each appellant; and (2) whether count 3 against Alfonso is time-barred (§ 803, subd. (e)).

---

*See footnote, *ante*, page 547.

Once the appropriate hearings are conducted, the trial court shall forward a corrected copy of the abstracts of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.

Ashmann-Gerst, J., and Chavez, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 12, 2009, S172942. Moreno, J., and Corrigan, J., did not participate therein.