* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II. through XI.
OPINION
Ramon Alfonso Zanoletti (Alfonso) and his wife Magdalena Rosalis Zanoletti (Magdalena) appeal from the judgments entered upon their convictions by jury of insurance fraud. Specifically, Alfonso was convicted of 19 counts of felony insurance fraud (Pen. Code, § 550, subd. (a)(1))[1] (counts 1, 4, 7, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 32, 34, 38, 40, 42 45), with findings of a fraudulent taking of more than $100,000 (§ 186.11, subd. (a)(3)) and damages exceeding $50,000 (§ 12022.6, subd. (a)(1)). He was also convicted of one count (count 3) of misdemeanor unauthorized practice of law (Bus. Prof. Code, § 6126, subd. (a)). Magdalena was convicted of the same insurance fraud counts and special allegations, plus another 19 counts of felony insurance fraud (§ 550, subd. (a)(5)) (counts 2, 5, 8, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 33, 35, 39, 41, 43 46), with the same special allegations.
The trial court denied probation and sentenced each appellant to 22 years in state prison calculated as follows: As to count 1, the midterm of three years; as to the remaining 18 counts under section 550, subdivision (a)(1), one year (or one-third the midterm) to be served consecutively; plus one year on the section 12022.6, subdivision (a)(1) allegation. Pursuant to section 654, the court stayed the sentence on count 3 (unauthorized practice of law), and stayed the sentences on the 19 additional counts of insurance fraud under section 550, subdivision (a)(5), striking the special allegations as to these counts.
The trial court also ordered each appellant to pay a $200 restitution fine (§ 1202.4, subd. (b)), a $20 DNA penalty assessment (Gov. Code, §76104.7), a $20 court security fee (§ 1465.8, subd. (a)(1)), a $200,000 aggravated white collar crime fine (§ 186.11, subd. (c)), and $108,533 in victim restitution to the defrauded insurance companies (§ 1202.4, subd. (f)), and imposed and suspended a $200 parole revocation fine (§ 1202.45). Appellants each received 55 days of custody credit.
On appeal, appellants each raise numerous contentions, including instructional errors, sufficiency of the evidence, expiration of a statute of limitations and sentencing errors. Magdalena also contends that she could not have been convicted of violating more than one subdivision of section 550 and that her convictions of violating both subdivision (a)(1) and (5) run afoul of the single-intent-and-plan doctrine. We disagree and publish this portion of our opinion. Although we find most of appellants' remaining contentions to be without merit in the unpublished portion of our opinion, we remand the *Page 1519 
matter for determination as to whether prosecution should be tolled on count 3 against Alfonso and for determination of certain penalty assessments. We also modify the judgments on our finding of sentencing errors. In all other respects, the judgments are affirmed.
 FACTUAL AND PROCEDURAL BACKGROUND
Prosecution Case
Background
Magdalena worked as an office manager at the Franklin Chiropractic Clinic on West 8th Street in Los Angeles (the clinic) and received an annual salary of $40,000. Clarence Franklin worked as a chiropractor at the clinic. Magdalena's husband Alfonso leased the space for the clinic and also leased some of the medical equipment, including the X-ray machine, and paid the clinic's telephone bill. Alfonso, who was not an attorney, had an office at the Law Offices of Taghizadeh Associates (the law office). Between December 12, 2003, and December 3, 2004, Alfonso received $183,115.42 from the law firm in sporadic checks of unequal sizes, often with the notation "for ex-services." Appellants filed joint tax returns.
On March 9, 2004, law enforcement arrested Constantino Pineda, a "capper" who specialized in organizing and staging car accidents for the purpose of engaging in insurance fraud. Pineda was in possession of a "capping book" that listed names, including Alfonso's, dates and other information pertaining to accidents he had organized. Also in his possession were business cards for Alfonso and the clinic. Based largely on information obtained from Pineda, search warrants were executed at the clinic and the law office. Various documents were seized from the clinic, including a capping book listing patients who corresponded to those in Pineda's capping book.
California Highway Patrol Sergeant Tannon Brown, an expert on automobile insurance fraud, led a multiagency investigation on insurance claims arising from patients listed in the clinic's capping book. The investigation focused on 21 patients, as discussed below, and the period between January 2003 and December 2004. Sergeant Brown opined that the clinic was an insurance fraud mill, that Alfonso was a capper who specialized in staging accidents and then referring people to both the clinic and the law office, and that Magdalena prepared fraudulent paperwork that was provided to the law office, which then submitted the paperwork to insurance companies in support of demands for payment. *Page 1520 
 Counts 1-3 (Jose Gabriel Martinez Ortiz), 4-5 (Manuel Trujillo), 7-8 (David Luna Hernandez)
On or about May 1, 2004, Jose Gabriel Martinez Ortiz, Manuel Trujillo and David Luna Hernandez were riding together in a truck when it was struck by another vehicle. They testified that Alfonso approached them, identified himself as an attorney, provided his contact information, and stated that he had seen the accident and taken photographs of the damage and that the men could be compensated for their injuries. Alfonso later drove Ortiz to the law office and agreed to act as his "attorney." Ortiz then went to the clinic, where he subsequently returned approximately 15 times for treatment that lasted only minutes; Dr. Franklin never asked Ortiz how the treatment was progressing. At Magdalena's direction, Ortiz signed sign-in sheets falsely indicating that he had received treatment 30 times.
Trujillo and Hernandez also went to the clinic. Trujillo went to the clinic approximately seven times and received cursory treatment. At Magdalena's direction, he signed sign-in sheets falsely indicating that he had received treatment 31 times. Hernandez, who was not injured in the accident, also signed for more treatments than he actually received.
The clinic submitted the falsified paperwork to the law office, which then submitted some of the paperwork to USAA Insurance Company, which paid approximately $18,000 to settle the claims. Ortiz, Trujillo and Hernandez subsequently received approximately $2,000 each from the law office. Trujillo and Hernandez pled guilty to insurance fraud. Ortiz was apparently charged with insurance fraud, but the record is not clear as to whether he pled guilty.
 Counts 10-11 (Veronica Mendez) and 12-13 (Silvia Gonzalez)
Sisters Veronica Mendez and Silvia Gonzalez participated in a staged car accident on February 7, 2004. Mendez testified that at the direction of an unidentified capper they went to the clinic where they met with Alfonso, who already knew about the accident. Mendez told Alfonso that she was not injured, but he told her that she would still receive treatment. Mendez testified that she and her sister went to the clinic approximately 15 times but, at Magdalena's direction, Mendez signed sign-in sheets indicating she had been to the clinic 29 times. Mendez testified that she signed in 15 times in one day. Gonzalez, who did not testify at trial, signed the same 29 sign-in sheets. At some point, the sisters went to the law office, where Alfonso explained that they would be deposed and instructed them how to describe the accident and their injuries. Mercury Insurance Company eventually paid $1,981 to settle their claims, and Mendez pled guilty to insurance fraud. *Page 1521 
Counts 14-15 (Lourdes Flores Mancia)
Lourdes Flores Mancia, who lived with Pineda, testified that she went with him to the clinic approximately four times in June 2003, despite having no injuries, and received cursory treatment from Dr. Franklin. At Magdalena's direction, she signed sign-in sheets falsely indicating that she had received treatment on additional occasions. She was represented by Attorney Martin Chu, who submitted falsified paperwork to Fanners Insurance Company, which paid $11,623 to settle the claim. She received a check for $4,000, and pled guilty to insurance fraud.
 Counts 16-17 (Daniel Marquez) and 18-19 (Maria Julia Villatoro)
Daniel Marquez and his wife Maria Julia Villatoro testified that on May 21, 2003, they participated in a staged car accident that was planned by Pineda. Although they were not hurt in the accident, they went to the clinic for treatment at Pineda's direction. They each received cursory treatment at the clinic on approximately five occasions but, at Magdalena's direction, they signed sign-in sheets falsely indicating that they had received treatment on numerous additional occasions. After five visits, Marquez told Magdalena that he did not want any more treatment, but she told him he needed to continue coming to the clinic or his case would be lost, and he signed in another five times before Dr. Franklin released him. Alfonso told Marquez to "fake" that his shoulder and back were hurting. The law office submitted the falsified paperwork to Western United Insurance Company, which paid $2,888 to settle the claims. Villatoro pled guilty to insurance fraud. Marquez was arrested, but it is not clear from the record whether he pled guilty or was even charged.
Counts 20-21 (Cindy Medrano)
Cindy Medrano, who was not injured, testified that she went to the clinic for treatment at the direction of a neighbor named Jose, who told her she could receive $1,000 by claiming to be injured. Medrano received cursory treatment at the clinic approximately four times, but signed sign-in sheets falsely claiming that she had received treatment 30 times. At least some of the paperwork was prepared by Magdalena. Medrano was represented by Attorney Michael Payman Kade, though she never met him. Kade submitted paperwork from the clinic to Mercury Insurance Company, which paid $3,500 to settle the claim. Medrano received $200, and pled guilty to insurance fraud.
 Counts 22-23 (Maria Estella Escobar) and 24-25 (Juana Pacas)
Maria Estella Escobar, her daughters Tiana and Mercy, and Juana Pacas were in a car accident on September 16, 2004. Escobar testified that at a *Page 1522 
coworker's suggestion she went to the clinic, where she was interviewed by Alfonso, who said he would take her case. Escobar referred Pacas to the clinic. Escobar and Pacas both testified that they went to the clinic approximately 18 times and received cursory treatment. At Magdalena's direction, both Escobar and Pacas signed sign-in sheets falsely indicating that they had received treatment on numerous additional occasions. Escobar also testified that Mercy received treatment at the clinic, but Tiana did not. The law office submitted the falsified paperwork in support of a demand on behalf of Escobar, both her daughters and Pacas. USAA Insurance Company paid $13,500 to settle the claims. Escobar and Pacas subsequently met Alfonso at the law office and received checks from him. Escobar pled guilty to insurance fraud.
 Counts 26-27 (Griselda Andino) and 28-29 (Sinthia Sandoval)
Griselda Andino and her daughter Sinthia Sandoval testified that they were in a car accident on November 4, 2004, and were referred to the clinic by a family friend. At Magdalena's direction, they both signed sign-in sheets falsely indicating that they had received treatment on far more occasions than they actually did. At some point Andino met with Alfonso to discuss her case, and Sandoval was under the impression that Alfonso was her attorney. The law office submitted paperwork from the clinic to Mercury Insurance Company, which did not pay any money on the claims. Both Andino and Sandoval pled guilty to insurance fraud.
Counts 32-33 (Giovanni Morales)
Giovanni Morales testified that he and three companions participated in a staged car accident on April 19, 2004. He and his companions were taken by an unidentified capper to the clinic, where they spoke to Alfonso. At Magdalena's direction, Morales signed sign-in sheets falsely indicating that he had received treatment on far more occasions than he actually did. The law office submitted paperwork from the clinic to Hartford Insurance Company, which paid $38,462 to settle the claims. Morales eventually received a check from the capper, and pled guilty to insurance fraud.
Counts 34-35 (Miguel Zuniga)
Miguel Zuniga testified that he was in a car accident in December 2003 and was told by a family friend that Alfonso was a "good lawyer." Zuniga met with Alfonso, who referred him to the clinic. Although he only received treatment approximately six times, at Magdalena's direction he signed sign-in sheets falsely indicating that he had received treatment approximately 30 times. The law office submitted paperwork from the clinic to Farmers *Page 1523 
Insurance Company, which paid $6,094 to settle the claim. Zuniga later went to the law office and received a check for $2,000. At Alfonso's insistence, he had his car fixed at Alfonso's body shop, and eventually pled guilty to insurance fraud.
 Counts 38-39 (Bernaldo Diaz Ramos), 40-41 (Jose Martin Ramos), 42-43 (Jose Santos Lara Cabrera) and 45-46 (Clorinda Gonzalez)
Bernaldo Diaz Ramos, his brother Jose Martin Ramos, Jose Santos Lara Cabrera and Clorinda Gonzalez were in a car accident in October 2003. They testified that they all went to the clinic for treatment and, at Magdalena's direction, they all signed sign-in sheets falsely indicating that they had received treatment on more occasions than they actually did. Bernaldo Ramos and Jose Cabrera met with Alfonso and believed him to be their attorney. The law office submitted paperwork from the clinic to Viking Insurance Company, which paid $12,000 to settle the claims. Jose Ramos eventually received a check for approximately $1,333 directly from Magdalena. He, his brother Bernaldo and Cabrera eventually pled guilty to insurance fraud.
Defense Evidence
Ines Guevara, Bertha Rios, Jesus Gonzalez and Jenny Lopez all testified that they received treatment at the clinic and they were never asked to sign for more treatments than they received.
Magdalena testified on her own behalf. She and Alfonso had been married 35 years and have two daughters. She had worked at the clinic approximately 11 years, and denied directing patients to sign for more treatments than they received. She attributed errors in the billings to human error. Alfonso would meet clients at the clinic and also discussed patients with her. Alfonso leased the space for the clinic and paid the clinic's telephone bill.
Alfonso testified on his own behalf. He worked at the clinic from 1992 through 1995 as an administrator, and again from 2003 to 2006, though he did not recall that time very well. He also began working at the law office around September 2003. As to the $183,000 he received from the law office in 2004, he cashed the checks, then returned an unspecified sum to the law office, though he paid taxes on the full amount. He acknowledged the leases for the clinic's space and medical equipment were in his name. He denied staging accidents, telling anyone to lie, offering to pay anyone for referrals and claiming to be an attorney. He met Pineda only once. He met with Daniel Marquez, and worked on the claims pertaining to Jose Gabriel Martinez Ortiz, Manuel Trujillo, David Luna Hernandez, Veronica Mendez, Silvia Gonzalez, Maria Estella Escobar, Juana Pacas, Griselda Andino, Sinthia *Page 1524 
Sandoval, Giovanni Morales, Miguel Zuniga, Bernaldo Diaz Ramos, Jose Martin Ramos, Jose Santos Lara Cabrera and Clorinda Gonzalez.
Pineda did not testify at trial.
Prosecution Rebuttal Evidence
Jose Gabriel Martinez Ortiz testified that Alfonso offered to pay him a $500 referral fee for referring accidents.
 DISCUSSION
I. Convictions of Both Section 550, Subdivision (a)(1) and (5).
Insurance fraud is proscribed by section 550, subdivision (a), which includes nine enumerated acts that constitute violations.[2] Each section 550, subdivision (a)(1) count charged against appellants related to an incident involving a specific individual; there was a corresponding subdivision (a)(5) charge for the same incident. For the first time on appeal, Magdalena contends that she could not have been convicted of violating both subdivisions of section 550, reasoning that the different subdivisions merely describe different means of committing the single offense of insurance fraud. She argues that because her conduct was more completely covered by section 550, subdivision (a)(5), she should not have been convicted of also violating section 550, subdivision (a)(1). Alternatively, she contends that her convictions of violating both subdivisions run afoul of the single-intent-and-plan doctrine.
A. Multiple Convictions Were Appropriate
The People agree that the various paragraphs of section 550, subdivision (a) describe different means of committing the single crime of *Page 1525 
insurance fraud and that a defendant cannot be convicted of multiple violations of section 550, subdivision (a) for the same act. For example, the People note that the conduct described in subdivision (a)(4) seems to be entirely encompassed by subdivision (a)(1). But they argue that Magdalena's multiple convictions were appropriate because they were based on different acts of fraud. We agree.[3]
Magdalena analogizes her case to People v. Ryan (2006)138 Cal.App.4th 360 [41 Cal.Rptr.3d 277], which concerned forgery convictions. The defendant in Ryan signed another person's name on a check and used that check to make a purchase at a Staples store. The defendant then signed another check in the same person's name and used that check to make a purchase at Gypsy Rose Antiques. As to each store, the defendant was convicted of one count of forgery by signing another's name (§ 470, subd. (a)), and one count of making or passing a forged check (§ 470, subd. (d)). (People v. Ryan, supra, at pp. 363-364.) The appellate court determined that the various subdivisions of section 470 described the same crime and that a defendant could not suffer multiple convictions of section 470 based on the forgery of a single instrument. (People v. Ryan, supra, at p. 364.) Because the defendant had used a "single instrument" for the Staples purchase and a "single instrument" for the Gypsy Rose Antiques purchase, the defendant could only be convicted of one count of forgery for each purchase. Thus, the court struck both counts of forgery by signing a person's name, but affirmed the two convictions for passing a forged check. (Id. at pp. 369-371.)
The Ryan court relied on the case of People v. Craig (1941) 17 Cal.2d 453
[110 P.2d 403], a rape case, in which the California Supreme Court concluded that the various subdivisions of section 261 described the same crime of rape, and therefore where there was only one act of intercourse, the defendant could not be convicted of both forcible rape (§ 261, former subd. 1) and statutory rape (§ 261, former subd. 1). (People v. Craig, supra, at p. 455.) *Page 1526 
We agree with the People that the case before us is more analogous toPeople v. Harrison (1989) 48 Cal.3d 321 [256 Cal.Rptr. 401, 768 P.2d 1078] (Harrison), People v. Richardson (1978) 83 Cal.App.3d 853 [148 Cal.Rptr. 120] (Richardson) and People v. Neder (1971)16 Cal.App.3d 846 [94 Cal.Rptr. 364] (Neder). In Harrison, the defendant attacked the victim and inserted his finger into her vagina. As the victim struggled, the defendant's finger became dislodged. He reinserted it a second time for a few seconds, it became dislodged again, and he reinserted it a third time for a few seconds. The entire encounter lasted less than 10 minutes. (Harrison, supra, at pp. 325-326.) The defendant's conviction of three counts of forcible penetration (§ 289) was affirmed by the California Supreme Court, which held that each penetration amounted to a new and separate crime because each penetration "completed" the crime. (Harrison, supra, at pp. 328-330.)
In Richardson, supra, 83 Cal.App.3d 853, a forgery case, the defendant obtained four City of Los Angeles Controller's warrants and made them payable to fictitious commercial payees for amounts in excess of $800,000 each. The defendant's convictions of four counts of forgery were upheld. The Court of Appeal stated: "`The real essence of the crime of forgery . . . is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud.'" (Id. at p. 866.) In Neder, supra,16 Cal.App.3d 846, the defendant signed a name to someone else's credit card and then used that card to make three purchases at a Sears department store in one day. The defendant's convictions of three counts of forgery were upheld. (Id. at pp. 849-850.)
Here, multiple convictions were appropriate. We demonstrate this by considering count 1 (§ 550, subd. (a)(1)) and count 2 (§ 550, subd. (a)(5)) pertaining to Jose Gabriel Martinez Ortiz. Ortiz went to the clinic for treatment 15 times, but at Magdalena's direction he signed sign-in sheets falsely stating that he received treatment 30 times. These sign-in sheets were clearly fraudulent. In addition, the paperwork completed as to the 15 times Ortiz actually received treatment was fraudulent, in that Ortiz testified his treatments only lasted minutes and Dr. Franklin never asked how he was progressing. Magdalena assisted in the preparation of this documentation, as well. She was appropriately convicted under section 550, subdivision (a)(5) for her role in personally creating such documents with the intent that they be presented in support of a fraudulent claim. Under this subdivision, the crime was complete as soon as the writing was completed.
With respect to the count under section 550, subdivision (a)(1), the evidence showed that the paperwork on Ortiz that was generated at the clinic *Page 1527 
was then forwarded to the law office, which submitted some of the paperwork to USAA Insurance Company in support of a fraudulent claim on Ortiz's behalf. Magdalena's separate convictions under section 550, subdivision (a)(1) were appropriately based on the fraudulent claims actually presented by her coconspirators. (See People v. Cohen (1970)12 Cal.App.3d 298, 321 [90 Cal.Rptr. 612] ["A violation of Insurance Code section 556 [precursor to § 550] is complete when a false claim for payment of loss is presented to an insurance company or a false writing is prepared or presented with intent to use it in connection with such a claim whether or not anything of value is taken or received."].) The same analysis applies to all of Magdalena's convictions. Because Magdalena either directly engaged in or conspired to engage in each of these separate acts of insurance fraud, her convictions under both section 550, subdivision (a)(1) and (5) were appropriate.
B. The Single-intent-and-plan Doctrine
Alternatively, Magdalena contends that her convictions under section 550, subdivision (a)(1) should be reversed because they were committed as part of the same single intent and plan as the corresponding section 550, subdivision (a)(5) crimes.
The single-intent-and-plan doctrine was articulated in People v.Bailey (1961) 55 Cal.2d 514, 518-519 [11 Cal.Rptr. 543, 360 P.2d 39], in which our Supreme Court concluded that it was appropriate to consolidate various petty thefts into a single conviction for grand theft, since all of the individual takings were part of a single plan. In that case, the defendant was found guilty of grand theft for unlawfully taking county welfare payments, for which she was ineligible, over an 18-month period. The issue before the court was whether the defendant was guilty of grand theft or a series of petty thefts as none of the individual payments was for greater than $200, but exceeded that amount in the aggregate. (Id. at p. 518.) The court explained that the test as to whether separate offenses were committed is whether one general intent or separate and distinct intents were established by the evidence. (Id. at p. 519.) The court noted that this determination depends on the facts of each case, and that a defendant may be convicted of separate counts charging grand theft from the same person "if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (Ibid.)
Magdalena acknowledges that the single-intent-and-plan doctrine has not been applied to the crime of insurance fraud. But she argues that it should be applicable because she was convicted of theft-related offenses. She seems to concede that her argument requires her substantive crimes of insurance fraud to be considered together with the damage enhancements. She also concedes *Page 1528 
that the doctrine does not apply to the crime of forgery, because forgery is concerned with the means, not the end, as we noted above. (SeeRichardson, supra, 83 Cal.App.3d at p. 866, quoting Neder, supra,16 Cal.App.3d at pp. 852-853.) Nor has the doctrine been applied to the crimes of identity theft (People v. Mitchell (2008) 164 Cal.App.4th 442,455-457 [78 Cal.Rptr.3d 855]) or burglary (People v. Washington (1996)50 Cal.App.4th 568, 576-579 [57 Cal.Rptr.2d 774]).
Insurance fraud under section 550 is also concerned with the means, rather than the end. As defined in subdivision (a)(5), the crime is complete when an individual "[k]nowingly prepare[s], make[s], or subscribe[s] any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim." Under subdivision (a)(1), the crime is complete when a fraudulent claim is "presented." While it can be argued that appellants had a general scheme to present fraudulent insurance claims, nevertheless, the preparation of any writing with the intent to use it to support a false claim constitutes one violation and the knowing presentation of a false claim constitutes another, separate violation. Based on the particular facts here, we find the single-intent-and-plan doctrine inapplicable to the crimes proven here.
II. Unanimity Instruction.*
Magdalena contends that the trial court erred in not instructing the jury with CALJIC No. 17.01 that it had to unanimously agree on which specific act or acts constituted a violation of section 550, subdivision (a)(1) and which act or acts constituted a violation of section 550, subdivision (a)(5).[4] Alfonso joins in this contention.
The general rule is that when an accusatory pleading charges the defendant with a single criminal act, and the evidence at trial tends to show more than one such unlawful act, either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the court must sua sponte instruct the jury that it must unanimously agree that the defendant committed the specific criminal act. A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged. (People v. Benavides (2005) 35 Cal.4th 69, 98; People v. Maury (2003)30 Cal.4th 342, 423.)
As to the counts under section 550, subdivision (a)(1), the court instructed the jury with CALJIC No. 15.40 as follows:
"Every person who with specific intent to defraud either directly and actively or aids and abets, solicits, or conspires with any person to:
"(1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance,
"(2) Knowingly cause or participate in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim,
"(3) Knowingly present a false or fraudulent claim for the payments of a loss for theft, destruction, damage or conversion of a motor vehicle, a motor vehicle part or contents of a motor vehicle, is guilty of a violation of Penal Code section 550, subdivision (a)(1), a crime.
"In order to prove this crime, each of the following elements must be proved:
"1. A person either directly and actively or aided and abetted, solicited, or conspired with another person to:
"Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance;
"Knowingly cause or participate in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim;
"Knowingly present a false or fraudulent claim for the payments of a loss for theft, destruction, damages or collision of a motor vehicle, a motor vehicle part or contents of a motor vehicle; and
"2. That person acted with the specific intent to defraud."
The jury requested clarification of the instruction, asking: "There are three numbered paragraphs listed in the instruction [CALJIC No.] 15.40. Do all three paragraphs have to be proved or just one of the paragraphs?" After conferring with counsel, the court responded: "To answer this in a nutshell, just one of the paragraphs, if all of you agree on that paragraph."
Magdalena argues that the court's direction to the jury was insufficient because it told the jury to agree on a particular paragraph
and not on a particular act. But Magdalena's argument overlooks the fact that each paragraph of the instruction related to a single act. Thus, by instructing the jury that it had to agree on a particular paragraph, the court was in effect instructing the jury that it had to agree on a particular act that constituted a violation of section 550, subdivision (a)(1). Although the court did not use the language of CALJIC No. 17.01, the instruction adequately instructed on the concept of unanimity. There is no reasonable likelihood that the jury misunderstood and misapplied the instruction. (People v. Wallace (2008) 44 Cal.4th 1032, 1075.)
With respect to the counts under section 550, subdivision (a)(5) Magdalena points out that the evidence adduced at trial suggested that she was engaged in personally preparing at least three different types of fraudulent writings in support of each claim and that Alfonso was also engaged in preparing fraudulent documents at the law office. We agree that the jury could have found her guilty of personally preparing fraudulent documents, conspiring with or aiding and abetting Alfonso in his preparation of fraudulent documents, or both. Thus, a unanimity instruction was required as to the counts under section 550, subdivision (a)(5). But we find that any error in failing to give a unanimity instruction was harmless under Chapman v. California (1967) 386 U.S. 18,24. (See People v. Deletto (1983) 147 Cal.App.3d 458, 471 [error in not giving unanimity instruction must be harmless beyond a reasonable doubt]; People v. Curry (2007) 158 Cal.App.4th 766, 783-784.) Appellants' defense as to all counts was that they did not participate in any fraud. Thus, guilt in this case rested on a determination of credibility. The verdicts make clear that the jury rejected appellants' version of events. Where the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. (People v.Thompson (1995) 36 Cal.App.4th 843, 852-853.)
III. Sufficiency of the Evidence.
Appellants both contend that there was insufficient evidence to support convictions against them on certain counts.
"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence." (People v. Kraft (2000) 23 Cal.4th 978, 1053.) Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt. (People v. Bradford (1997)15 Cal.4th 1229, 1329.) Reversal on this ground is unwarranted unless "`upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (People v. Bolin (1998) 18 Cal.4th 297, 331.)
A. Count 14
Alfonso argues there was insufficient evidence to support his conviction on count 14, pertaining to Lourdes Flores Mancia, because "there was no evidence that Mancia had any connection at any time withappellant or the law firm for which he worked, no evidence that she faked injuries, no evidence that she signed in for too many clinic visits, and no evidence that she was arrested or charged with insurance fraud." But appellant's argument overlooks Mancia's testimony that she went to the clinic and received treatment despite having no injuries, that at Magdalena's direction she signed in for more treatments than she received and that she pled guilty to insurance fraud for her role in this case. There was ample evidence that Mancia's claim was fraudulent.
Alfonso's assertion that he had no connection with Mancia because there was no evidence that he ever met her and because the evidence showed that her insurance claim was filed by an attorney who did not work at the law office overlooks the evidence that appellants were involved in an ongoing conspiracy to commit insurance fraud and that Mancia's claim arose from that conspiracy.
A conspiracy exists when the defendant and another person have the specific intent to commit an offense and a member of the conspiracy commits an overt act in furtherance of the conspiracy. (§§ 182, 184;People v. Morante (1999) 20 Cal.4th 403, 416.) Evidence is sufficient to prove a conspiracy if it supports an inference that the parties "`positively or tacitly came to a mutual understanding to commit a crime.'" (People v. Rodrigues (1994) 8 Cal.4th 1060, 1135; People v.Gonzalez (2004) 116 Cal.App.4th 1405, 1417.) "`The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.'" (People v. Rodrigues, supra, at p. 1134-1135.) "`"The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime, usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts of the same complete whole."'" (People v. Jones (1986) 180 Cal.App.3d 509, 517, citation omitted.)
Here, the evidence overwhelmingly established that appellants were part of a sophisticated conspiracy to make fraudulent insurance claims Alfonso paid the leases for both the clinic and its medical equipment and paid the clinic's telephone bill. Mancia was brought to the clinic by Pineda, a capper who was part of the conspiracy, and though she was not injured, Mancia received treatment from Dr. Franklin, who was also part of the conspiracy. At Magdalena's direction, Mancia signed for more treatments than she actually received. Evidence that Alfonso spoke to Mancia or to anyone about her claim was not required. The sum of the evidence was sufficient for the jury to conclude that Mancia's claim arose from the ongoing conspiracy between appellants to commit insurance fraud. (SeePeople v. Superior Court (Shamis) (1997) 58 Cal.App.4th 833, 843-846
[finding sufficient evidence for a jury to conclude that the defendant, an administrator at a law firm that worked on personal injury claims, had conspired to stage car accidents to commit insurance fraud and could be held liable for the murder of one of the participants of a staged accident].)
B. Count 20
Alfonso also argues there was insufficient evidence supporting his conviction on count 20, pertaining to Cindy Medrano, because there was no evidence that she ever met Alfonso and because the evidence showed that her insurance claim was submitted by an attorney who did not work at the law office. Again, evidence that Alfonso spoke to Medrano or to anyone about her claim was not required. Overwhelming evidence established that Alfonso was part of an ongoing conspiracy to commit insurance fraud and that Medrano's claim was simply one of many fraudulent claims arising from that conspiracy.
C. Counts 12 and 13
Magdalena argues there was insufficient evidence to support her convictions on counts 12 and 13, relating to Silvia Gonzalez because there was no substantial evidence that Gonzalez signed for more treatments than she received. Although Gonzalez did not testify, her sister Veronica Mendez did. Mendez testified that she and Gonzalez participated in a staged accident, the unidentified capper who arranged the accident directed them to the clinic where Alfonso met them and already knew about the accident, and she and Gonzalez went to the clinic for treatment the same number of times — approximately 15 times — but at Magdalena's direction she signed for another 15 treatments in one day The sign-in sheets were admitted into evidence and show that both sisters signed the same 29 sheets. Clearly, there was sufficient evidence for the jury to find that Gonzalez signed in for more treatments than she received.
IV. Accomplice Instructions.
Magdalena contends that the trial court's failure to instruct the jury on the law of accomplice testimony was instructional error requiring reversal. Alfonso joins in this contention.
In California, whenever the evidence is sufficient to permit a jury to conclude by a preponderance of the evidence that a testifying witness was an accomplice, the trial court must sua sponte instruct the jury (1) to view the accomplice's testimony with suspicion, and (2) that the defendant cannot be convicted on the basis of the accomplice's testimony unless it is corroborated. (People v. Hernandez (2003) 30 Cal.4th 835,873-874; People v. Zapien (1993) 4 Cal.4th 929, 982; § 1111 ["A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense"].) It is firmly established by numerous authorities, including those cited by Magdalena, that "[c]orroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." (People v. Whisenhunt (2008) 44 Cal.4th 174, 215; People v.Williams (2008) 43 Cal.4th 584, 638.) The corroborating evidence may be entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. (People v. McDermott (2002) 28 Cal.4th 946, 986.) "The evidence `is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'" (People v. Lewis (2001) 26 Cal.4th 334, 370.) A defendant's own testimony and inferences therefrom may be sufficient corroborative testimony. (People v. Ruscoe (1976) 54 Cal.App.3d 1005, 1012.) Indeed, evidence of flight or an attempt of the accused to conceal his or her identity supports an inference of consciousness of guilt sufficient to corroborate the testimony of an accomplice. (People v. Perry (1972)7 Cal.3d 756, 771-772; People v. Felton (2004) 122 Cal.App.4th 260,272; People v. Ruscoe, supra, at p. 1012.)
The trial court instructed the jury with CALJIC No. 3.10 (defining accomplices), CALJIC No. 3.11 (accomplice testimony must be corroborated) and CALJIC No. 3.12 (defining corroboration). As the court began to read CALJIC No. 3.13 (testimony of one accomplice may not corroborate another), it called a sidebar and stated that it agreed with defense counsel's earlier position that accomplice instructions were not appropriate. The court then reread to the jury CALJIC No. 3.10 and proceeded to read other jury instructions. The court did not instruct the jury to disregard the instructions that it originally read, but CALJIC No. 3.10 was the only accomplice instruction included in the jury's packet.
In light of the testimony of numerous witnesses that they had been charged with or pled guilty to insurance fraud for their roles regarding the insurance claims at issue, the People concede that the trial court erred in failing to sua sponte instruct the jury with CALJIC Nos. 3.13 and 3.18 (accomplice testimony to be viewed with care and caution). But the People argue that "in light of the wealth of corroborating evidence," such error was harmless under People v. Watson (1956) 46 Cal.2d 818, 836
(See People v. Lewis, supra, 26 Cal.4th at p. 371; People v. Whisenhunt,supra, 44 Cal.4th at p. 215.)
The People demonstrate harmless error by taking as an example count 1, pertaining to the insurance claim involving Jose Gabriel Martinez Ortiz, made pursuant to section 550, subdivision (a)(1). The charge on count 1 was that appellants either personally or aided, abetted, solicited or conspired with someone else to knowingly present or cause to be presented a false or fraudulent claim for the payment of a loss or injury Magdalena told Sergeant Brown that she had worked on Ortiz's medical reports. The paperwork generated on Ortiz at the clinic shows that it was forwarded to the law office where Alfonso worked, and Alfonso testified that he worked on Ortiz's insurance claim. The parties stipulated that USAA Insurance Company paid on the claim regarding Ortiz and that the "claim included documentation created by Franklin Chiropractic." Appellants also testified that Alfonso paid the lease on the clinic and the medical equipment used at the clinic and that Alfonso met clients at the clinic.
Similar evidence exists for all of the counts brought under section 550, subdivision (a)(1). The parties stipulated that all of the subject insurance companies received claims that "included documentation created by Franklin Chiropractic." This documentary evidence was presented at trial and the parties stipulated that "[a]ll of the medical documents, billings and notes presented as exhibits in this case are authentic business records." Magdalena testified that her job at the clinic included typing up patients' medical reports, working on the billings and directing patients to sign the sign-in sheets. Alfonso testified that he worked on nearly all of the claims. We agree with the People that this independent evidence is sufficient to corroborate that appellants either personally or aided, abetted, solicited or conspired with someone else to knowingly present or cause to be presented claims for the payment of a loss or injury.
This same independent evidence was sufficient to corroborate the counts brought against Magdalena under section 550, subdivision (a)(5), that she either personally or aided, abetted, solicited or conspired with another person to knowingly prepare, make or subscribe a writing with the intent to present or use it, or allow it to be presented, in support of any false or fraudulent claim.
Magdalena argues that there was no corroborating evidence specifically as to the element that the claims were fraudulent. She points out that in the absence of the accomplices' testimony that she told them to sign for more treatments than they received, and in the absence of Pineda's out-of-court statements as reflected in Sergeant Brown's testimony, [5]
there was no evidence that any of the claims presented was actually fraudulent. But there is no requirement that the corroborating evidence establish every element of the crime. The corroboration required is evidence tending to connect the defendant to the crime. In this case, we find that the corroborating evidence was sufficient because it tended to connected appellants to the crimes. Moreover, each of the accomplices was subjected to vigorous cross-examination by defense counsel. And both the prosecutor and the defense counsel pointed out in closing argument that the issue was which of the stories should be believed. Thus, the jury knew that the accomplice testimony should be viewed with caution Accordingly, the instructional error was harmless.
V. CALJIC No. 2.11.5.
Magdalena contends that the trial court committed reversible error by instructing the jury with CALJIC No. 2.11.5. Alfonso joins in this contention.
Without objection, the trial court instructed the jury pursuant to CALJIC No. 2.11.5 as follows: "There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crime for which that defendant is on trial. There may be many reasons why that person is not here on trial. Therefore, do not speculate or guess as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of each defendant on trial."
Magdalena cites to the Use Note to CALJIC No. 2.11.5, which states that this instruction should not be used if the other person is a witness for either the prosecution or defense. She also cites to cases for the proposition that this instruction "`should not be given when a nonprosecuted participant testifies because the jury is entitled to consider the lack of prosecution in assessing the witness's credibility.'" (People v. Williams (1997) 16 Cal.4th 153, 226; People v.Lawley (2002) 27 Cal.4th 102, 162-163.) She asserts that all of the accomplices who testified were unprosecuted co-participants in the crimes because they were charged with insurance fraud, but the disposition and prosecution of their cases depended on them giving honest testimony in this case. She therefore contends that the court erred in instructing the jury with CALJIC No. 2.11.5.
But Magdalena's contention ignores that there were potential accomplices who did not testify. The People point out that Clarence Franklin, the chiropractor at the clinic, was charged as a codefendant in this case, but his case was severed in light of his serious health issues and he did not testify. There was evidence presented at trial establishing that Dr. Franklin was guilty of the same insurance fraud crimes as appellants. The lawyers who presented the fraudulent insurance claims were not part of the case. The evidence at trial indicated that they were also guilty of insurance fraud. The instruction appropriately told the jury not to speculate as to why these witnesses were not being prosecuted. Thus, there was no error in instructing the jury with CALJIC No. 2.11.5.
Moreover, appellants failed to object to the instruction below or otherwise to request a clarifying instruction that CALJIC No. 2.11.5 be limited to those witnesses who did not testify. Any assignment of error has been forfeited on appeal. (People v. Sully (1991) 53 Cal.3d 1195,1218.)
In any event, any instructional error was harmless because it is not reasonably likely that appellants would have received a more favorable result had the instruction been modified. (See People v. Murillo (1996)47 Cal.App.4th 1104, 1107-1108 [erroneous jury instruction as to jury's evaluation of witness credibility is analyzed for prejudice underPeople v. Watson, supra, 46 Cal.2d at p. 836].) In People v. Malone
(1988) 47 Cal.3d 1, the error in giving CALJIC No. 2.11.5 was deemed harmless in light of the following factors: (1) evidence that the witness was an accomplice and was testifying pursuant to a plea bargain, (2) the trial court instructed the jury with CALJIC Nos. 2.20 (determining credibility of a witness) and 3.16 (accomplice testimony should be viewed with distrust), and (3) defense counsel argued that the witness was an accomplice hoping to avoid punishment for his role in the crime. (Peoplev. Malone, supra, at p. 51.)
Likewise here, evidence was presented that each of the witnesses who testified had been charged with insurance fraud for their role in the crimes and was testifying pursuant to a plea agreement, defense counsel emphasized that the testifying witnesses were pursuing plea bargains and argued that they were not impartial witnesses, and the court instructed the jury with the standard instructions regarding the credibility of a witness (CALJIC Nos. 2.20, 2.21.1, 2.21.2, 2.23, 2.23.1). Any error in failing to clarify the application of CALJIC No. 2.11.5 was harmless.
 VI. Statute of Limitations on Prosecution of Misdemeanor Charge.
In count 3, Alfonso was charged with the unauthorized practice of law, a misdemeanor. (Bus. Prof. Code, § 6126, subd. (a) (section 6126).) Under section 801, subdivision (a), the prosecution of such an offense must commence within one year of the commission of the offense Prosecution is commenced when an indictment, information or complaint is filed or when an arrest warrant or bench warrant is issued. (§ 804.)
Here, count 3, as described in the information, focused on the time period between May 1, 2004 and November 2, 2004. The complaint was not filed until June 2006. Alfonso therefore contends that prosecution of count 3 was time-barred. But section 803, subdivision (e), provides that the limitations period for section 6126 does not begin to run "until the offense has been discovered, or could have reasonably been discovered." The California Supreme Court has concluded that "when the charging document indicates on its face that the action is time-barred, a person convicted of a charged offense may raise the statute of limitations at any time. If the court cannot determine from the available record whether the action is barred, it should hold a hearing or, if it is an appellate court, it should remand for a hearing." (People v. Williams (1999)21 Cal.4th 335, 341.) Because the information did not allege facts supporting tolling and Alfonso did not raise the issue in the trial court that count 3 was time-barred, it is the People's position that underWilliams the matter should be remanded for a hearing to determine whether count 3 was time-barred. We agree and therefore remand for such a hearing.
VII. Denial of Probation.
In sentencing appellants, the trial court denied probation and imposed a term of imprisonment. For the first time on appeal, Alfonso contends this was error because (1) during the sentencing hearing, the prosecutor mentioned something a juror said after the verdict, (2) the trial court cited Alfonso's lack of remorse, and (3) the trial court failed to "give any weight" to various mitigating factors. Magdalena joins in these arguments and makes the additional argument that the trial court failed to explain the reasons for denying probation.
Because appellants failed to raise these issues before the trial court, they have forfeited these claims of error on appeal. "[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (People v. Scott (1994) 9 Cal.4th 331, 356.) This includes situations in which "the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons." (Id. at p. 353.) Even assuming there had been no forfeiture, appellants' arguments are without merit.
A trial court exercises broad discretion in determining whether a defendant is suitable for probation. (People v. Monge (1997)16 Cal.4th 826, 850.) The trial court's judgment is presumed to be correct and must be affirmed unless it is "`arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.'" (People v. Weaver (2007) 149 Cal.App.4th 1301, 1311.) In deciding whether to impose probation, the trial court must consider both the general objectives in sentencing (Cal. Rules of Court, rule 4.410)[6] and the various factors relating to the crime and to the defendant as set forth in rule 4.414. It is presumed that the trial court has considered these factors "unless the record affirmatively reflects otherwise." (Rule 4.409.)
Alfonso asserts that it was error for the court to "react" to a juror's posttrial statement, as reflected by the prosecutor. During the sentencing hearing, the prosecutor informed the court that after the trial he was walking through a grocery store when a juror noticed him and asked what had happened with the case, the prosecutor responded that sentencing had not yet taken place, and the juror then said "something to the effect of I can't believe no one was hurt. I can't believe by the grace of God no one was hurt." Contrary to Alfonso's assertion, the reporter's transcript of the hearing does not reflect that the trial court "reacted" or otherwise responded to this comment. Moreover, the "nature, seriousness, and circumstances of the crime" is a specifically enumerated factor justifying denial of probation. (Rule 4.414(a)(1).) Appellants were part of a sophisticated conspiracy that included staging car accidents and submitting fraudulent insurance claims. It takes little imagination to realize that staged car accidents pose a significant risk of injury, even death, not only to the participants but to third parties. As such, it cannot reasonably be said that appellants were in any way prejudiced by such a remark communicated to the court.
Alfonso also asserts that the trial court should not have considered lack of remorse as a factor in denying probation. But whether the defendant is remorseful is a specifically enumerated factor in justifying denial of probation. (Rule 414(d)(9); People v. Leung (1992)5 Cal.App.4th 482, 507-508 ["Lack of remorse is properly utilized as a reason for denying probation even when the defendant does not admit his guilt where, such as in this case, the evidence of guilt is overwhelming"].)
Appellants also claim that the trial court failed to give proper weight to various mitigating factors, including that appellants did not have prior criminal records, had strong family and community relationships and had successfully complied with a home monitoring program, and that Magdalena had serious health issues. Appellants' attorney stressed these mitigating factors at the sentencing hearing and in his sentencing memorandum and other documents filed on behalf of appellants. Prior to imposing sentence the trial court stated that it had "fully reviewed all of the documents in this matter" and that it had "ample opportunity to think about" what sentence to impose. Thus, the record does not suggest that the trial court failed to consider mitigating factors. "[E]ven if there were several mitigating factors that might weigh in favor of probation, this does not necessarily mean that the trial court abused its discretion in deciding against granting probation." (People v. Ramirez
(2006) 143 Cal.App.4th 1512, 1530-1531; People v. Rich (1988)45 Cal.3d 1036, 1123-1124 ["The fact that the court failed to find sufficient mitigation to outweigh the aggravating factors does not mean that the court failed to consider all of defendant's mitigating evidence"].)
Finally, Magdalena asserts that the trial court failed to properly explain the reasons justifying its denial of probation. But the reporter's transcript of the sentencing hearing shows otherwise. The court stated that it had considered the criteria of rule 4.414, including "the nature and seriousness and circumstances of the crime, as compared to [other instances] of the same crime, whether the defendant's actions facilitated application of physical or emotional injury, whether the defendant was an active participant, defendant's lack of remorse, and the likelihood, if not imprisoned, defendant will be a danger to others." The court also stated that it had considered the general objectives of sentencing as set forth in rule 4.410 and the primary considerations in granting probation as set forth in section 1202.7, including "protecting society, punishment, deterrence, crime prevention, restitution, uniformity in sentencing, and reintegration of the defendant into society. The court finds that there would not be a likelihood that defendant would succeed upon a grant of probation."
We find no abuse of discretion in the trial court's denial of probation.
VIII. Stay of Sentences.
Appellants contend that their sentences as to counts 4, 7, 12, 18, 24, 40, 42 and 45 must be stayed under section 654. They reason that because the parties stipulated that there were 10 separate vehicular accidents, they should only have been sentenced on 10 counts, as opposed to 19 counts for each of the 19 individuals involved in the accidents.
Section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." In determining whether criminal conduct gives rise to more than one act within the meaning of section 654, the court must consider the intent and objective of the actor. A defendant may be punished for only one offense if all of the offenses were incident to one objective. (People v. Latimer (1993)5 Cal.4th 1203, 1208.) If all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be found to have harbored a single intent and therefore may be punished only once. (Harrison, supra, 48 Cal.3d at p. 335.) "If, on the other hand, defendant harbored `multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, `even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (Ibid.) A defendant's intent and objective are questions of fact for the trial court; the meaning of section 654 is a legal matter. (People v. Guzman (1996)45 Cal.App.4th 1023, 1028.) A reviewing court must affirm if substantial evidence supports a trial court's express or implied determination that the acts were committed for more than one objective (People v. Osband (1996) 13 Cal.4th 622, 730-731; People v. Norrell
(1996) 13 Cal.4th 1, 6.)
Although the parties agreed that there were 10 separate accidents, there were more than 10 fraudulent claims made for insurance benefits Fraudulent insurance claims were presented on behalf of each of the 19 individuals involved. (See Neder, supra, 16 Cal.App.3d at pp. 855-856
[three separate punishable offenses of forgery occurred under section 654 where the defendant made three different purchases in a single store in one day using another individual's credit card].) We find that substantial evidence supports the trial court's determination that each of the 19 counts was based on a separate fraudulent insurance claim, and sentences on the separate counts were not required to be stayed pursuant to section 654.
IX. Imposition of Consecutive Sentences.
Alfonso contends that the imposition of consecutive sentences based on facts that were neither found by the jury nor admitted by him violated his Sixth Amendment right to a jury trial, citing Blakely v. Washington
(2004) 542 U.S. 296 (Blakely) and Apprendi v. New Jersey (2000)530 U.S. 466 (Apprendi).[7] Magdalena joins in this contention.
As conceded by Alfonso, People v. Black (2007) 41 Cal.4th 799 (Black) held that imposition of consecutive terms under section 669 does not implicate a defendant's Sixth Amendment right to jury trial. The Black
court's reasoning and holding is equally applicable to section 654 cases. The Black court stated: "The high court's decision in [Cunninghamv. California (2007) 549 U.S. 270] does not call into question the conclusion we previously reached regarding consecutive sentences. The determination whether two or more sentences should be served in this manner is a `sentencing decision[] made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense' and does not `implicate[] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense.' [People v. Black (2005)35 Cal.4th 1238, 1264.] Accordingly, we again conclude that defendant's constitutional right to jury trial was not violated by the trial court's imposition of consecutive sentences on all three counts." (Black, supra,41 Cal.4th at p. 823.)
We are bound by the principle of stare decisis to follow the decisions of the California Supreme Court (Auto Equity Sales, Inc. v. SuperiorCourt (1962) 57 Cal.2d 450, 455), and conclude that imposition of consecutive sentences based on the trial court's findings does not violate the Sixth Amendment right to jury trial.
X. Credit for Home Detention.
The trial court gave each appellant 55 days of credit, consisting of 37 days of actual time and 18 days of conduct time for days spent in the county jail, but denied them credit for the time spent on electronic home monitoring. Appellants contend that the denial of credit for time spent on electronic home monitoring violates sections 2900.5 and 4019, as well as their equal protection rights.
In 1991, section 2900.5, former subdivision (a) was amended to add "home detention programs" to those forms of custody for which a defendant would be entitled to presentence credit. (People v. Anaya (2007)158 Cal.App.4th 608, 612, fn. 3 (Anaya).) On January 1, 1999, the current version of section 2900.5, subdivision (a) took effect. As appellants acknowledge, the statute no longer includes "home detention programs" among those forms of custody for which a defendant is entitled to presentence credit.[8] (Anaya, supra, at p. 612, fn. 3.)
Appellants nevertheless argue that home detention still falls with section 2900.5, subdivision (a)'s catch-all introductory phrase "including, but not limited to." But this same argument was rejected inAnaya, which noted the general rule that "`"[i]t is ordinarily to be presumed that the Legislature by deleting an express provision of a statute intended a substantial change in the law."'" (Anaya, supra,158 Cal.App.4th at p. 612.) Appellants were not entitled to custody credit under section 2900.5 for time spent on electronic home monitoring. We also find no merit to appellants' contention that they were entitled to conduct credit under section 4019, subdivision (a), since that section does not include home detention as one of the forms of custody for which a defendant would be entitled to conduct credit Rather, section 4019, subdivision (a) provides that conduct credits may be awarded to those who are in custody in a county or city jail, industrial farm, or road camp pending sentencing.
Nor do we find merit to appellants' equal protection arguments. To establish an equal protection claim, a defendant must show "that the state has adopted a classification that affects two or more similarlysituated groups in an unequal manner." (In re Eric J. (1979) 25 Cal.3d 522,530.) As explained in People v. Reinertson (1986) 178 Cal.App.3d 320,327, all of the forms of custody itemized in section 2900.5, subdivision (a) confine the defendant in a facility other than his home, regulate the defendant's visitation, require participation in a program, and incorporate close supervision in a structured lifestyle. The same is true for those forms of custody itemized in section 4019. (See People v.Lapaille (1993) 15 Cal.App.4th 1159, 1172-1173 [finding no equal protection violation in denial of conduct credits to a defendant on house arrest as a condition of release on his own recognizance].) Appellants make no persuasive arguments that the conditions of their confinement were so restrictive. We find no equal protection violation.
XI. Imposition of Additional Fees and Penalties.
A. Security Fees
The People request that additional security fees be imposed on each appellant. The trial court imposed a single $20 security fee on each appellant. But section 1465.8, subdivision (a)(1) provides: "To ensure and maintain adequate funding for court security, a fee of twenty dollars ($20) shall be imposed on every conviction for a criminal offense, including a traffic offense. . . ." The security fee is mandatory and the statute includes no requirement that a defendant have the ability to pay the fine. (See People v. Smith (2001) 24 Cal.4th 849, 852-853 [imposing mandatory parole revocation fine for the first time on appeal].) The fees must be imposed even as to crimes that were committed before section 1465.8 became operative on August 17, 2003. (People v. Alford (2007)42 Cal.4th 749, 752.) And the fee must be imposed even as to those convictions for which punishment was stayed under section 654. (Peoplev. Crittle (2007) 154 Cal.App.4th 368, 370-371.)
Alfonso was convicted of 20 crimes (the People erroneously claim 21 crimes). Thus, he must be ordered to pay 20 $20 court security fees for a total of $400. Magdalena was convicted of 38 crimes. Thus, she must be ordered to pay a total of $760. The judgment must be so modified.
 B. Penalty Assessments As to the White Collar Crime Fine
The trial court ordered each appellant to pay a $200,000 aggravated white collar crime fine. (§ 186.11, subd. (c).) The People contend that the trial court did not impose the mandatory penalty assessments as to the white collar crime fines and that the judgments must therefore be modified. Specifically, as to each $200,000 aggravated white collar crime fine, the People claim that the following penalty assessments must be imposed: A 20 percent court surcharge ($40,000) (§ 1465.7, subd. (a)); a 100 percent state penalty assessment ($200,000) (§ 1464); a 10 percent ($20,000) DNA fingerprint penalty (Gov. Code, § 76104.6, subd. (a)); a 10 percent ($20,000) DNA identification fund penalty (Gov. Code, § 76104.7); a 70 percent ($140,000) county penalty assessment (Gov. Code, § 76000); and a $3 state court facilities construction fund penalty (Gov. Code, §§70372, subd. (a), 70375, subd. (b)), for a total of $420,003 as to each white collar crime fine.
As we shall conclude, not all of these penalties can be imposed here The DNA identification fund penalty (Gov. Code, § 76104.7) cannot be imposed because it is ex post facto to the crimes committed here. The DNA fingerprint penalty (Gov. Code, § 76104.6) is also ex post facto to certain crimes and the matter must be remanded for a proper determination of this penalty. Also, as set forth below, the matter must be remanded for a determination of whether the state penalty assessment (§ 1464) and the state court facilities construction fund penalty (Gov. Code, § 70372) should be waived for each appellant due to hardship.
 1. No Prohibition of Penalties Under Section 186.11, Subdivision (l)
As an initial matter, Alfonso argues that all of the requested penalties are prohibited by section 186.11, subdivision (l), which provides in relevant part: "Unless otherwise expressly provided, the remedies or penalties provided by this section are cumulative to each other and to the remedies or penalties available under all other laws of this state. . . . If a fine is imposed under this section, it shall be in lieu of all other fines that may be imposed pursuant to any other provision of law for the crimes for which the defendant has been convicted in the action." As the court explained in People v. Lai (2006)138 Cal.App.4th 1227, the language in section 186.11, subdivision (l) can be understood to recognize the distinction between restitution fines that must be imposed for conviction of any crime, and penal fines that may be imposed only for conviction of particular crimes. (People v. Lai,supra, at p. 1252.) Thus, the language in section 186.11, subdivision (l) precluding "`all other fines that may be imposed pursuant to any other provision of law for the crimes for which the defendant has been convictedin the action'" describes discretionary penal fines that apply to specific offenses. (People v. Lai, supra, at p. 1252.)
Here, all of the additional penalties the People seek to have imposed are in the nature of restitution fines that must be imposed for all criminal offenses. (See § 1464, subd. (a) [penalty "shall be levied" for "all criminal offenses"]; § 1465.7 [surcharge "shall be levied"]; Gov Code, § 70372, subd. (a) [penalty "shall be levied" for "all criminal offenses"]; Gov. Code, § 76000 [additional penalty "shall be levied" for "all criminal offenses"]; Gov. Code, § 76104.6 [additional penalty "shall be levied" for "all criminal offenses"]; Gov. Code, § 76104.7 [additional penalty "shall be levied" for "all criminal offenses"].) Consequently, section 186.11, subdivision (l) does not preclude imposition of these additional penalties.
2. Ex Post Facto Prohibition
Alfonso contends that the DNA fingerprint penalty under Government Code section 76104.6, subdivision (a) and the DNA identification fund penalty under Government Code section 76104.7 are ex post facto to all crimes that were committed prior to their effective dates. He is correct. Government Code section 76104.6 took effect on November 3, and has been determined to be "a punitive ex post facto law with respect to offenses committed prior to its effective date." (People v. Batman (2008)159 Cal.App.4th 587, 591.) The same is true for Government Code section 76104.7, which took effect on July 12, 2006.
With respect to Government Code section 76104.6's effective date of November 3, 2004, Alfonso argues that all but two of the counts involved accidents occurring prior to this date (counts 26 and 28 involved accidents occurring one day later on November 4, 2004). But the date of the accidents is not the only date by which to determine when the crimes occurred, particularly since not all of the accidents were staged. From our own review of the record, we note that counts 22 and 24 did not involve a staged accident and involved the presentment of fraudulent claims to USAA Insurance Company after November 3, 2004. Thus, it appears that Government Code section 76104.6 would not be ex post facto to these counts. The record thus reveals that as to all of the counts (except counts 22, 24, 26 28), the offenses were committed prior to November 3, 2004. But the proper amount of this penalty is addressed below.
As to the DNA identification fund penalty assessment under Government Code section 76104.7, all of the offenses for which appellants were convicted were committed prior to the statute's effective date of July 12, 2006. Thus, no such penalty may be imposed. Accordingly, the judgments are modified to strike the $20 DNA penalty assessment imposed under Government Code section 76104.7.[9]
 3. Imposition of DNA Penalty Under Government Code Section 76104.6
Government Code section 76104.6, subdivision (a)(1) provides in relevant part that "for the purpose of implementing the DNA Fingerprint, Unsolved Crime and Innocence Protection Act, there shall be levied an additional penalty of one dollar for every ten dollars ($10), or part of ten dollars ($10), in each county upon every fine, penalty, or forfeiture imposed and collected by the courts for all criminal offenses. . . ." Here, the fine triggering imposition of this penalty is the $200,000 aggravated white collar crime fine under section 186.11, subdivision (c). Of the four counts that are not ex post facto with respect to the DNA penalty assessments under section 76104.6 (counts 22, 24, 26 28), Alfonso argues that counts 26 and 28 are insufficient to trigger a section 186.11 aggravated white collar crime fine because Mercury Insurance Company paid nothing on these claims, and therefore the DNA penalty assessed should be zero.
But as to counts 26 and 28 for both appellants, the jury found true, as it did for all of the counts, the "allegation pursuant to Penal Code Section 186.11(a)(3), that the offenses are related felonies, a material element of which is fraud and embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of more than one hundred thousand dollars." Thus, it would appear that counts 26 and 28 could trigger the white collar crime fine along with the other counts. In any event, because the $200,000 aggravated white collar fine was imposed by the court as an aggregate amount and not broken down by count, we cannot determine from the record the amount of the DNA fingerprint penalty assessment for the white collar crime fine on the four counts (22, 24, 26 28) that are not ex post facto, and thus the matter is remanded for a determination of the appropriate amount by the trial court.
4. Waiver for Hardship
Finally, Alfonso points out that under both section 1464, pursuant to which the People seek a $200,000 state penalty assessment, and Government Code section 70372, under which the People seek a $3 state court facilities construction fund penalty, [10] the statutes provide: "In any case where a person convicted of any offense, to which this section applies, is in prison until the fine is satisfied, the judge may waive all or any part of the . . . penalty, the payment of which would work a hardship on the person convicted or his or her immediate family." (§ 1464, subd. (d); Gov. Code, § 70372, subd. (e).) Alfonso claims the matter should be remanded to the trial court for a determination as to whether the state penalty assessment (§ 1464, subd. (a)(1)) and the state court facilities construction fund penalty (Gov. Code, § 70372, subd. (a)) should be waived in light of his prison sentence. We agree and remand the matter for this determination by the trial court as to each appellant.
 DISPOSITION
Each judgment is modified as follows: (1) to strike the $20 court security fees (§ 1465.8, subd. (a)(1)) and instead to impose a $400 security fee on Alfonso and a $760 security fee on Magdalena; (2) to impose a $40,000 court surcharge (§ 1465.7, subd. (a)); (3) to impose a $140,000 county penalty assessment (Gov. Code, § 76000); (4) to strike the $20 DNA identification fund penalty assessment (Gov. Code, § 76104.7); and (5) to correct that the $200,000 fine is an aggravated white collar crime fine (§ 186.11, subd. (c)) and not "restitution."
The matter is remanded for determination by the trial court of (1) whether the state penalty assessment (§ 1464) and the state court facilities construction fund penalty (Gov. Code, § 70372) should be waived for each appellant due to hardship; (2) the appropriate amount of the DNA identification fund penalty assessment (Gov. Code, § 76104.6) to be imposed on each appellant; and (3) whether count 3 against Alfonso is time-barred (§ 803, subd. (e)). *Page 1529 
Once the appropriate hearings are conducted, the trial court shall forward a corrected copy of the abstracts of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.
Ashmann-Gerst, J., and Chavez, J., concurred.
[1] All further statutory references are to the Penal Code, unless otherwise noted.
[2] Section 550, subdivision (a) provides in relevant part: "It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:
"(1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.
"(2) Knowingly present multiple claims for the same loss or injury, including presentation of multiple claims to more than one insurer, with an intent to defraud.
"(3) Knowingly cause or participate in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim.
"(4) Knowingly present a false or fraudulent claim for the payments of a loss for theft, destruction, damage, or conversion of a motor vehicle, a motor vehicle part, or contents of a motor vehicle.
"(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim."
[3] Magdalena alternatively argues that if we find that subdivision (a)(1) through (5) of section 550 constitute separate offenses and do not merely describe different ways in which to commit insurance fraud, her convictions under section 550, subdivision (a)(5) must still be reversed because they are based on a legally insufficient theory. Her argument is that when the trial court instructed the jury on the elements of section 550, subdivision (a)(1), it included the elements of section 550, subdivision (a)(3) and (4) and told the jury such conduct could support a conviction under section 550, subdivision (a)(1). She points out that a defendant cannot be convicted of an offense that was neither charged nor necessarily included in the charged offense. (People v. Lohbauer (1981)29 Cal.3d 364, 368 [173 Cal.Rptr. 453, 627 P.2d 183].) But because we agree that the various paragraphs of section 550, subdivision (a) simply describe different means of committing the single crime of insurance fraud, there was no instructional error. Absent a problem of notice, there is no error when an information alleges one theory of guilt but the trial court instructs the jury on a different theory. (See People v.Kelly (2007) 42 Cal.4th 763, 791-792 [68 Cal.Rptr.3d 531, 171 P.3d 548] [no error where information alleged malice murder but jury was instructed on felony murder].)
* See footnote, ante, page 1516.
[4] CALJIC No. 17.01 states: "The defendant is accused of having committed the crime of ___ [in Count ___]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on Count ___] may be based Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of the [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count ___], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."
[5] Out-of-court statements made by an accomplice to the police, or after the accomplice's arrest, fall within the scope of evidence that must be corroborated under section 1111. (People v. Belton (1979)23 Cal.3d 516, 523-527; People v. Jeffery (1995) 37 Cal.App.4th 209,218 ["testimony" within meaning of section 1111 includes out-of-court statements by accomplice made under circumstances likely to induce self-serving motives, such as when accomplice has been arrested or is questioned by police].)
[6] All further references to rules are to the California Rules of Court.
[7] Alfonso notes that on March 17, 2008, the United States Supreme Court granted certiorari in Oregon v. Ice (Mar. 17, 2008, No. 07-901)76 U.S.L.W. 3496, 2008 U.S. Lexis 2387 to address the question of whether the Sixth Amendment as construed in Apprendi and Blakely requires that facts other than prior convictions necessary to impose consecutive sentences be found by the jury or admitted by the defendant.
[8] The current version of section 2900.5, subdivision (a), states in part: "In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including, but not limited to, any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, juvenile detention facility, or similar residential institution, all days of custody of the defendant, including days served as a condition of probation in compliance with a court order, . . . shall be credited upon his or her term of imprisonment. . . ."
[9] The judgments must also be modified to reflect that the $200,000 fine to be paid by appellants is an aggravated white collar crime fine under section 186.11, subdivision (c), and not "restitution" under section 1202.4, subdivision (f).
[10] The People do not specify how the amount of $3 was calculated. *Page 1530